900 F.2d 1285
 BOSTWICK IRRIGATION DISTRICT,
and
Kansas-Bostwick Irrigation District No. 2, Appellant,
v.
UNITED STATES of America, Appellee.
BOSTWICK IRRIGATION DISTRICT, Appellant,
Kansas-Bostwick Irrigation District No. 2,
v.
UNITED STATES of America, Appellee.
 Nos. 88-2342, 88-2343.
 United States Court of Appeals,
Eighth Circuit.
 Submitted June 12, 1989.
Decided April 17, 1990.
 
 C.L. Robinson, Omaha, Neb., for appellant.
 Edward Shawaker, Washington, D.C., for appellee.
 Before JOHN R. GIBSON and WOLLMAN, Circuit Judges, and BROWN,* Senior Circuit Judge.
 WOLLMAN, Circuit Judge.
 
 
 1
 Bostwick Irrigation District and Kansas-Bostwick Irrigation District No. 2 appeal the district court's[1] denial of their request for declaratory judgment, brought under 43 U.S.C. Sec. 390uu, seeking to enjoin the Bureau of Reclamation of the Department of Interior (Bureau) from charging the Districts for expenses incurred by the Army Corps of Engineers (Corps) for operation and maintenance of the Harlan County Dam and Reservoir. We affirm.
 
 
 2
 The district court's lengthy, thorough memorandum opinion recites fully the factual background that gave rise to this litigation. We will summarize that history here.
 
 
 3
 The Harlan County Dam and Reservoir, established for the purposes of flood control and irrigation, is located along the Republican River in Harlan County, Nebraska. Construction was commenced in 1946 and completed in 1952.
 
 
 4
 On February 21, 1949, the United States, through the Bureau, entered into an irrigation agreement with the Bostwick Irrigation District. The agreement is divided into two parts. Part A governs water service and specifies the rates at which water is delivered to the District; part B governs the distribution works. Article 8(a) of part A originally provided that the contracting officer was obligated during each year of the development period to "announce to the district, in writing, the rate per acre-foot for which water will be delivered to the District during the ensuing year, estimated to cover at least operation and maintenance costs." Article 8(b) originally provided that after the development period "the District shall make payment annually for the delivery of the * * * water supply in an amount announced by the contracting officer not to exceed forty-one thousand dollars ($41,000.00)." Part B provided that the District would repay the United States' construction costs in building the water supply works. The amount specified was $2,260,000, payable in 40 equal installments.
 
 
 5
 In 1954, the United States and the District amended Article 8 of the agreement. Article 8(a) continued to define the rates for the development period, and article 8(b) continued to define the rates for the post-development period. The amendment also provided that whenever payments to the United States under 8(a) and 8(b) were "insufficient to cover the operation and maintenance costs of the reserved water supply works as defined in Article 9(b), the District shall pay to the United States the amount of such deficiency as determined and announced by the Secretary within 30 days of the receipt of the notice of such deficiency." The parties amended the agreement in a similar manner in 1957 and 1963.
 
 
 6
 In 1970 the Bureau notified the District for the first time that the cost of operation and maintenance exceeded the annual water service payment. In the following fourteen years, the Bureau notified the District eleven times of an excess of costs. All of the excess costs were the result of Bureau expenses.
 
 
 7
 On April 20, 1951, the United States, through the Bureau, entered into an irrigation agreement with the Kansas-Bostwick Irrigation District No. 2. The agreement was similar to the original U.S.-Bostwick Irrigation District agreement, and like that agreement it was amended several times. In 1957, the agreement was amended to provide that "[w]henever in any year during the term of this Part A payments by the District * * * are insufficient to cover the cost of operation and maintenance of water supply works * * * operated by the United States the District shall pay to the United States the amount of such deficiency, as determined and announced by the Secretary [of Interior], within thirty days after receipt of the notice of such deficiency." In 1963, an amendment to the agreement eliminated this language, but similar language was included in Article 8(b) of the agreement. This language was again changed in 1972, but no material alterations were made.
 
 
 8
 In 1971 the Bureau notified the Kansas-Bostwick Irrigation District that the cost of operation and maintenance exceeded the annual water service payment. It again gave the District notice of excess costs in 1979, 1980, 1981, 1982, and 1983. All of these excess charges were for Bureau expenses.
 
 
 9
 In 1981 and 1982, the General Accounting Office reviewed the operation and maintenance cost recovery systems established by the Bureau and the Corps. It discovered that through an administrative oversight the Districts had been required to pay only the operation and maintenance costs of the Bureau and not those of the Corps. Accordingly, on June 25, 1982, the Bureau advised both Districts that "beginning in 1983, a share of operation and maintenance costs for Harlan County Reservoir, which was allocated to its irrigation purpose by the Corps of Engineers, will be included in the operation and maintenance costs for the reserved water supply works pursuant to the provisions of article 8 of the contract."[2]
 
 
 10
 The Districts thereupon brought this action for a declaration that the Bureau has no authority to collect the Corps' operating and maintenance expenses. The district court granted judgment for the United States, finding that (1) there is statutory authority for recovery of the Corps' operation and maintenance expenses; (2) the language and structure of the irrigation agreements is consistent with recovery of the Corps' operation and maintenance expenses; and (3) there are no defenses to prevent collection of the Corps' expenses. The Districts appeal.
 
 I. Statutory Authorization
 
 11
 Our analysis begins with determining whether the Bureau has statutory authorization to collect the operation and maintenance costs of the Corps. We set forth a brief review of the history of the pertinent legislation. For a much more detailed account of the genesis of the legislation that resulted in the construction of the several flood control and irrigation projects in the Missouri River Basin, see this court's opinion in Missouri v. Andrews, 787 F.2d 270 (8th Cir.1986), and the Supreme Court's opinion in ETSI Pipeline Project v. Missouri, 484 U.S. 495, 108 S.Ct. 805, 98 L.Ed.2d 898 (1988), which affirmed Andrews.
 
 
 12
 Due to severe flooding in the Missouri River Basin in 1943 and 1944, Congress requested the Army Corps of Engineers to prepare a flood control plan. The result was the Pick Plan, which described a comprehensive plan to develop the entire Basin. During the same time, the Interior Department's Bureau of Reclamation independently developed a plan for the Missouri River Basin. The plan, named the Sloan Plan, was also comprehensive, but its central purpose was to provide for irrigation. In 1944, a congressional committee met to reconcile the two plans. The result was the Pick-Sloan Plan, which ultimately fostered the Flood Control Act of 1944 (Act). 33 U.S.C. Secs. 701-1 to 709.
 
 
 13
 Section 8 of the Act provides that the Corps controls the main-stem reservoir projects and the Interior Department controls any irrigation works that it constructs, operates, or maintains at the main-stem reservoir projects. See 43 U.S.C. Sec. 390. Section 8 also provides that "irrigation works may be undertaken only after a report and findings thereon have been made by the Secretary of the Interior * * * and, within the limits of the water users' repayment ability such report may be predicated on the allocation to irrigation of an appropriate portion of the cost of structures and facilities used for irrigation and other purposes." Id.
 
 
 14
 Section 8 specifically provides that the Department of Interior exercises its authority under the federal reclamation laws. Id. We previously summarized this authorization as follows:
 
 
 15
 The thrust of [section 8] is to make the reclamation laws applicable to irrigation benefits made available from irrigation works constructed in Army-controlled multiple-purpose reservoirs. The salient concern is to ensure that the details of the reclamation laws--addressing such matters as cost allocation and acreage limitations--apply to contracts for irrigation benefits from reservoirs undertaken by the Army.
 
 
 16
 Missouri v. Andrews, 787 F.2d at 283. Thus, section 8 of the Flood Control Act makes applicable to the Harlan County Dam and Reservoir Project--an Army-constructed and maintained reservoir that supplies irrigation benefits--the Reclamation Project Act of 1939, 43 U.S.C. Secs. 485-485k.
 
 
 17
 Section 9(e) of the Reclamation Project Act authorizes the Secretary of Interior to enter into short or long-term contracts to furnish water for irrigation purposes. Section 9(e) also provides that
 
 
 18
 [e]ach such contract shall be * * * at such rates as in the Secretary's judgment will produce revenues at least sufficient to cover an appropriate share of the annual operation and maintenance cost and an appropriate share of such fixed charges as the Secretary deems proper, due consideration being given to that part of the cost of construction of works connected with water supply and allocated to irrigation * * *.
 
 
 19
 43 U.S.C. Sec. 485h(e).
 
 
 20
 Read together, section 8 and section 9(e) authorize the collection of operation and maintenance costs incurred by the Corps. The reclamation laws define the Interior Department's authority to control irrigation works at Corps constructed reservoirs, requiring the Department to recover the operation and maintenance costs of irrigation works from irrigation users. Section 9(e) does not limit recoverable operating and maintenance irrigation costs to those incurred by any particular government entity. Rather, section 9(e) embodies Congress' intent that beneficiaries of irrigation projects built by the government pay their allocable share of the project's operation and maintenance expenses.
 
 
 21
 This reading of the statutes is affirmed by the Reclamation Reform Act of 1982. Section 212 of that Act[3] provides generally that the provisions of the federal reclamation laws are not applicable to lands receiving benefits from federal water resource projects constructed by the Corps. Section 212, however, provides the following exception:
 
 
 22
 Notwithstanding any other provision of this section to the contrary, obligations that require water users, pursuant to contracts with the Secretary, to repay the share of construction costs and to pay the share of the operation and maintenance and contract administration costs of a Corps of Engineers project which are allocated to conservation storage or irrigation storage shall remain in effect.
 
 
 23
 43 U.S.C. Sec. 390ll. This exception supports the government's contention that existing statutes authorized the Bureau to hold water users responsible for the Corps' operation and maintenance and contract administration expenses.
 
 
 24
 We conclude, therefore, that the district court was correct in holding that the Bureau is statutorily authorized to collect the Corps' operation and maintenance costs. There remains the question whether the water users' contract with the Department of Interior requires repayment of these costs.
 
 II. Contractual Authorization
 
 25
 The irrigation contracts between the United States and the Districts have required from their inception that the Districts "pay to the United States" the operation and maintenance costs of water supply works operated and maintained by the United States. The contracts themselves do not specify whether these costs are limited to the expenses of the Bureau alone or whether they include the expenses of the Corps.
 
 
 26
 The Districts contend that the contractual language limits their obligation to the Bureau's costs alone because the contracts were made and amended by the United States "acting through the Secretary of Interior." We find this contention to be without merit.
 
 
 27
 As a practical matter, every contract by the United States must be entered into through an individual governmental entity. The entity acts as an agent for, and contracts on behalf of, the United States. The United States, however, remains the principal of the contract and is not restricted by the identity of the agency acting on its behalf. The fact that the contracts were made and amended by the United States "acting through the Secretary of Interior" has no bearing on whether the Districts are responsible for the Corps' operation and maintenance expenses.
 
 
 28
 As indicated above, the contract with each District is divided into two parts. Part A, which is expressly based on section 9e of the 1939 Reclamation Project Act, governs the delivery of water to the District and the method of payment therefore. Article 8d of the Bostwick contract provides as follows:
 
 
 29
 Whenever in any year during the term of this Part A payments by the District pursuant to subsection b of this Article 8 are insufficient to cover the cost of operation and maintenance of water supply works operated by the United States, the District shall pay to the United States the amount of such deficiency, as determined and announced by the Secretary, within thirty days after receipt of the notice of such deficiency. The basis for charging operation and maintenance costs hereunder shall be the ratio that the irrigation capacity of the water supply works bears to the total capacity of such works. (Emphasis added.)
 
 
 30
 We note some significant aspects of this provision. First, the "cost of operation and maintenance of water supply works operated by the United States" perforce includes the expenses of the Corps, which is an agency of the United States.
 
 
 31
 Likewise, the operation and maintenance costs are calculated on the ratio between the irrigation capacity of the water supply works and the total capacity of such works. The implication flowing from this provision is that the water supply works have a capacity that is significantly larger than the irrigation capacity. The provision must refer to the Harlan County Dam and Reservoir as a water supply works with such capacity, and which, under the reclamation laws, is therefore controlled not only by the Interior Department, but also by the Corps.
 
 
 32
 Article 9 of the contract governs the water supply works which were built by the United States and later transferred to the District. Prior to transfer, they were to be maintained by the United States. After transfer, they would be maintained by the District. Article 9c provides in part:
 
 
 33
 So long as the United States shall maintain such transferred water supply works, the District shall pay to the United States the cost of such maintenance as determined by the Secretary in advance of the delivery of water through such works. Such payments shall be in addition to those to be made by the District to the United States pursuant to sub-sections b and c of Article 8 of this contract.
 
 
 34
 The United States continues to maintain the Harlan County Dam and Reservoir, and the District pays for irrigation services under subsections b and c of Article 8. Thus, the language of Article 9c indicates that the District must pay the operating and maintenance expenses of the Harlan County Dam and Reservoir that are in addition to the District's regular payments.
 
 
 35
 Although the wording of the Kansas-Bostwick District contract is somewhat different from that of the Bostwick District contract, we conclude that the operative force of the language contained therein is the same: that the District is required to pay for a portion of the Corps' operating and maintenance expenses.
 
 
 36
 III. Defenses to Collection of the Corps' Expenses
 
 
 37
 The Districts have raised as defenses to collection of the Corps' operating and maintenance expenses the doctrines of estoppel, laches, and waiver and modification. As did the district court, we find that none of these defenses is available to the Districts.
 
 A. Estoppel
 
 38
 Although it has refused to rule out the possibility that in an appropriate case the doctrine of estoppel might be applied against the United States, see, e.g., Heckler v. Community Health Servs., 467 U.S. 51, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984), the United States Supreme Court has yet to apply the doctrine against the government. We have indicated that in the absence of affirmative misconduct, misrepresentations or misinformation given by its agents normally will not estop the government. Free Enterprise Canoe Renters Ass'n v. Watt, 711 F.2d 852, 857 (8th Cir.1983).
 
 
 39
 Whatever the prerequisites to the application of the doctrine against the government may be, we agree with the district court that the ordinary requirements of estoppel have not been established by the Districts. As the Court pointed out in Heckler, 467 U.S. at 59, 104 S.Ct. at 2223, before an estoppel arises a party must make a misrepresentation or take an action with reason to believe that the other party will rely upon it. Moreover, the second party must not have access to the truth and must rely upon the first party's action to its detriment.
 
 
 40
 Here, the language of the contracts was as available to the Districts as it was to the Bureau. Moreover, there is nothing in the record to indicate that the Bureau had knowledge that it kept from the Districts.
 
 
 41
 The harm or detriment claimed by the Districts is that they negotiated construction contracts for irrigation facilities under the amendments to the contracts and thereby added to their obligation to pay for the facilities under the mistaken belief that they would not have to pay the Corps' operating and maintenance expenses. The district court rejected as highly speculative the Districts' argument that if they had known they would have to pay the Corps' operating and maintenance expenses they would not have chosen to construct the additional facilities. We agree with the district court's characterization of this argument. Likewise, we agree with the district court that the Districts' only detriment is that of not continuing to receive water without paying their share of the operating and maintenance costs. This loss is similar to that described by the Supreme Court in Heckler: the loss of a benefit to which the Districts were not entitled. Indeed, as the district court pointed out, because the government has waived any repayment of pre-1984 operating and maintenance expenses, the Districts will retain that which they were not entitled to under the terms of the amended contracts.
 
 
 42
 In sum, then, we agree with the district court that because the Districts have established none of the requisite elements of estoppel, there is no basis for estopping the United States from asserting its claim to recover the Corps' prospective operating and maintenance costs.
 
 B. Laches
 
 43
 The doctrine of laches is an equitable defense to be applied when one party is "guilty of unreasonable and inexcusable delay that has resulted in prejudice" to the other party. Goodman v. McDonnell Douglas Corp., 606 F.2d 800, 804 (8th Cir.1979), cert. denied, 446 U.S. 913, 100 S.Ct. 1844, 64 L.Ed.2d 267 (1980). Whatever the application of this doctrine to private parties, we have recognized the long-standing rule that laches does not apply in actions brought by the United States. See United States v. Brown, 835 F.2d 176 (8th Cir.1987); Guaranty Trust Co. v. United States, 304 U.S. 126, 58 S.Ct. 785, 82 L.Ed. 1224 (1938).
 
 
 44
 In any event, the Districts can show no prejudice as a result of the delay by the Bureau in asserting the claim for operating and maintenance expenses. As indicated above, the United States has agreed not to seek reimbursement of pre-1984 expenses. Accordingly, if anything the Districts are in effect benefiting from the government's long delay in asserting the duty imposed upon it by statute and contract to collect these expenses.
 
 C. Waiver and Modification
 
 45
 The Districts contend that the Bureau chose to waive payment of the Corps' operating and maintenance expenses. We agree with the district court that the express anti-waiver clauses in the contracts bar the assertion of this defense. Those clauses state:
 
 
 46
 No waiver at any time by the United States of its rights with respect to default or any other matter arising in connection with this contract shall be deemed to be a waiver with respect to any subsequent default or matter. All rights of action for breach of this contract are reserved to the United States as provided in Section 3737 of the Revised Statutes of the United States, as amended (41 U.S.C. 15).
 
 
 47
 Bostwick contract Section 23(d); Kansas-Bostwick contract Section 26(d).
 
 
 48
 Likewise, we agree with the government's position that there was no modification of the contracts by virtue of the course of dealing between the Bureau and the Districts.
 
 CONCLUSION
 
 49
 The district court's judgment is affirmed.
 
 
 
 *
 The HONORABLE JOHN R. BROWN, United States Senior Circuit Judge for the Fifth Circuit, sitting by designation
 
 
 [1]
 The Honorable Warren K. Urbom, United States District Judge for the District of
 Nebraska.
 
 
 [2]
 The United States has agreed not to seek reimbursement of any pre-1984 operating and maintenance expenses
 
 
 [3]
 Section 212 applies to the agreements between the United States and the Districts. The Reclamation Reform Act provides that "[a]ny district which has an existing contract with the Secretary as of October 12, 1982 * * * shall be subject to Federal Reclamation law in effect immediately prior to October 12, 1982, as that law is amended or supplemented by sections 209 through 230 of this title." 43 U.S.C. Sec. 390cc(b)