**SUMNER PECK RANCH, INC., a California corporation, et al.**

v.

**BUREAU OF RECLAMATION, et al.**

**No. CV–F–91–048 OWW.**

United States District Court,
E.D. California,
Fresno Division.

May 28, 1993.

William M. Smiland, Donnelly, Clark, Chase & Smiland, Los Angeles, CA, for plaintiffs.

Thomas William Birmingham, Adolphus Moskovitz, Kronick, Moskovitz, Tiedemann & Girard, Sacramento, CA, for defendant Westlands Water Dist.

Daniel Bensing, U.S. Atty's Office, Fresno, CA, for defendant U.S.

Michael Victor Sexton, Minasian, Minasian, Minasian, Spruance, Baber, Meith & Soares, Oroville, CA, for defendant Firebaugh Canal Co. (Firebaugh Canal Co. is a defendant in a separate action which was partially consolidated with regard to this motion to dismiss).

MEMORANDUM OPINION AND ORDER RE: WESTLANDS WATER DISTRICT'S MOTION TO DISMISS AND FEDERAL DEFENDANTS' MOTION FOR SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS

WANGER, District Judge.

This matter comes before the Court based on motions made by two sets of defendants named in Plaintiffs' "Second Amended Complaint For Equitable and Monetary Relief," filed on February 18, 1992. Westlands Water District ("Westlands") seeks dismissal of Plaintiffs' Second Amended Compliant pursuant to Fed.R.Civ.P. 12(b). The "Federal Defendants," consisting of the Bureau of Reclamation, the Department of the Interior and the United States, seek partial summary judgment and judgment on the pleadings.

Hearings on the motions were held on April 16 and 19, 1993. Plaintiffs were represented by William M. Smiland, Esq. and Theodore A. Chester, Jr., Esq. Westlands was represented by Thomas W. Birmingham, Esq. The Federal Defendants were represented by Daniel Bensing, Esq. All arguments made by the parties have been considered.

## I.

## STANDARDS FOR REVIEWING MOTIONS TO DISMISS; FOR JUDGMENT ON THE PLEADINGS; AND FOR SUMMARY JUDGMENT

A motion to dismiss for failure to state a claim under F.R.C.P. 12(b)(6) "is viewed with disfavor and is rarely granted." *Hall v. City of Santa Barbara,* 833 F.2d 1270, 1274 (9th Cir.1986), *cert. denied,* 485 U.S. 940, 108 S.Ct. 1120, 99 L.Ed.2d 281 (1988) (*quoting* 5 C. Wright & A. Miller, *Federal Practice & Procedure,* Civil § 1357, at 598 (1969)). "[A] complaint should not be dismissed for failure to state a claim unless it appears beyond a doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 102, 2 L.Ed.2d 80 (1957).

In deciding a motion to dismiss, the court "must accept as true all material allegations in the complaint and construe them in the light most favorable to" the plaintiff. *NL Industries, Inc. v. Kaplan,* 792 F.2d 896, 898 (9th Cir.1986). Yet, the court need not accept as true allegations that contradict

facts which may be judicially noticed. *Mullis v. United States Bank Ct.*, 828 F.2d 1385, 1388 (9th Cir.1987), *cert. denied,* 486 U.S. 1040, 108 S.Ct. 2031, 100 L.Ed.2d 616 (1988). For example, the court may consider matters of public record including pleadings, orders, and other papers filed with the court or records of administrative bodies. *Mack v. South Bay Beer Distributors, Inc.*, 798 F.2d 1279, 1282 (9th Cir.1986). The court need not accept conclusory allegations, nor unreasonable inferences or unwarranted deductions of fact. *Western Mining Council v. Watt,* 643 F.2d 618, 624 (9th Cir.1981), *cert. denied,* 454 U.S. 1031, 102 S.Ct. 567, 70 L.Ed.2d 474 (1981). In addition, the court may disregard allegations in the complaint if contradicted by facts established by exhibits attached to the complaint. *Durning v. First Boston Corp.,* 815 F.2d 1265, 1267 (9th Cir. 1987).

■ A Rule 12(c) motion challenges the legal sufficiency of the opposing party's pleadings. Judgment on the pleadings is appropriate when, even if all material facts in the pleading under attack are true, the moving party is entitled to judgment as a matter of law. *Hal Roach Studios v. Richard Feiner & Co.,* 883 F.2d 1429, 1436 (9th Cir.1989). The court must assume the truthfulness of the material facts alleged in the complaint. All inferences reasonably drawn from these facts must be construed in favor of the responding party. *General Conference Corp. of Seventh-Day Adventists v. Seventh Day Adventist Congregation Church,* 887 F.2d 228, 230 (9th Cir.1989), *cert. denied,* 493 U.S. 1079, 110 S.Ct. 1134, 107 L.Ed.2d 1039 (1990).

Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). A genuine issue of fact exists when the non-moving party produces evidence on which a reasonable trier of fact could find in its favor viewing the record as a whole in light of the evidentiary burden the law places on that party. *Anderson v. Liberty Lobby,* 477 U.S. 242, 252–56, 106 S.Ct. 2505, 2512–14, 91 L.Ed.2d 202 (1986). The non-moving party cannot simply rest on its allegation without any significant probative evidence tending to support the complaint. *Id.* at 249, 106 S.Ct. at 2510. Evidence submitted in support of or in opposition to a motion for summary judgment must be admissible under rules governing admission of evidence generally. *Hal Roach Studios,* 883 F.2d at 1437.

■ The more implausible the claim or defense asserted by the opposing party, the more persuasive its evidence must be to avoid summary judgment. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). Nevertheless, "[t]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in its favor." *Liberty Lobby,* 477 U.S. at 255, 106 S.Ct. at 2513. The Court's role on summary judgment, however, is not to weigh the evidence, *i.e.,* issue resolution, but rather it is issue finding. *Id.*

## II.

### WESTLANDS' MOTION TO DISMISS

Plaintiffs summarize claims made against Westlands Water District as follows:

The second claim (¶¶ 126–131) seeks declaratory and injunctive relief with respect to fourteen controversies (¶ 128(a)–(n)) concerning Westlands' duties owed to Plaintiffs, including its alleged duties under the 1963 Service Contract, the 1965 Repayment Contract, the 1965 merger of the former Westplains district into and with the original Westlands district, and the 1986 Stipulated Judgment, and as a fiduciary of Plaintiffs.

The seventh claim (¶¶ 162–177) seeks tort damages and equitable relief for claims sounding in negligence, trespass, nuisance, failure to discharge mandatory duties, and dangerous condition of public property.

The eighth claim (¶¶ 178–184) alleges that Westlands has breached the 1963 Service Contract, the 1965 Repayment Contract, the contracts relating to the merger of the former Westplains and the original Westlands, and the 1986 Stipulated Judgment, and seeks

money damages and appropriate equitable relief for such breaches.

The ninth claim (¶¶ 185–195) asserts that Westlands has taken, and damaged, Plaintiffs' property for public use, but has failed to pay them just compensation as required by the California and United States Constitutions. The property alleged to have been taken includes flowage or easements upon, and contract and statutory rights appurtenant to, Plaintiffs' lands.

### A. *Claims for Declaratory and Injunctive Relief*

 The second claim for relief seeks declaratory and injunctive relief as to fourteen alleged controversies between Plaintiffs and Westlands. Westlands seeks dismissal of four of these subclaims.

Westlands contends the claims alleged contained in paragraphs 128(c), 128(e), 128(f), and 128(j) are barred by the doctrine of res judicata because each of these subclaims either was asserted or could have been asserted in the *Barcellos* litigation which resulted in the 1986 Stipulated Judgment. Paragraph 128(c) alleges that Westlands breached its duties under the 1963 Service Contract in failing to construct drainage works. 128(e) alleges that Westlands violated its duties to, and the rights of, Area I landowners and water users arising from the 1965 merger with Area II. It specifically alleges that funds appropriated for construction of the drain and collector system were diverted by Westlands to build the water delivery distribution system in Area II. Paragraph 128(f) alleges that Westlands has breached a fiduciary duty as created by California law by failing to honor the drainage rights of Area I which are senior to the delivery rights of Area II. Paragraph 128(j) alleges that Area I landowners and water users are entitled to stop paying fees for drainage service and to recover past payments. These payment obligations arise under the 1963 Service Contract, the 1965 Repayment Contract, and the 1986 Stipulated Judgment.

Paragraph 86 of the complaint alleges that paragraphs 14.1, 14.7, and 15 of the *Barcellos* Judgment expressly provide that the stipulated dismissal did not affect claims regarding drainage. These provisions of the Judgment state, in pertinent part:

14.1. Notwithstanding this Judgment and the parties' voluntary dismissal of all claims for relief pleaded in these present actions, the claims for relief pleaded in these present actions, the claims described in ... *Paragraphs 14.1.3 through 14.1.8 below are not affected by this Judgment.*

14.1.7 *Any claim of any landowner or water user against the District arising out of or relating to* [the April 3, 1985 Agreement], *drainage service, or Drainage Service facilities.*

15. *Past Contracts, Water Allocation and Pricing.* All parties have voluntarily dismissed with prejudice all claims for relief pleaded in these actions arising out of any Interim Contract, [the April 3, 1985 Agreement], any Internal Allocation Rule or any Internal Pricing Rule ... Notwithstanding the foregoing, *any landowner or water user may assert in any other action any claim for relief referred to in Paragraph 14.1.6 and 14.1.7. above and seek any remedy provided by law* with respect thereto.

(emphasis added).

In its reply brief, Westlands appears to concede Plaintiffs' point. It states, "[t]he claims of plaintiffs against the District arising out of the April 3, 1985 Agreement, or relating to drainage service or drainage service facilities are not barred by *res judicata* principles. Under paragraphs 14.1, 14.1.7 and Article 15 of the Barcellos Judgment, such claims are not affected by the Judgment."[1] Westlands' Reply at 34–35. Yet Westlands then inexplicably argues that the subclaims in question must be dismissed be-

---

1. In its opening brief, Westlands argued that other paragraphs of the complaint were similarly barred by the doctrine of res judicata. The paragraphs were 165, 168, 169 and 170 (alleging tort claims); paragraphs 179 and 180 (alleging contract claims); and paragraph 189 (alleging an inverse condemnation claim). By conceding in its reply brief that paragraphs 14.1.7 and 15 of the *Barcellos* Judgment prevent application of the doctrine of res judicata to all claims other than those contained in paragraph 128 of the complaint, Westlands has abandoned its argument as to these additional claims.

cause, "*Barcellos* determined the rights of Area I landowners under the Merger Law and all claims for relief asserted in that action based upon the Merger Law are barred by principles of *res judicata.*" *Id.*

To the extent Westlands' argument is comprehensible, it must be rejected, as Paragraphs 14.1.7 and 15 of the *Barcellos* Judgment explicitly allow Plaintiffs to seek any remedy under any cause of action regarding drainage. All four subclaims seek declaratory relief regarding Plaintiffs' right to drainage. That the subclaims revolve around matters also at issue in the *Barcellos* Judgment, *e.g.*, the 1963 Contract and the 1965 merger, does not alter the nature of these subclaims concerning drainage. Westlands' strongest argument centers around subclaims 128(e) and 128(j), which concern drainage funding and fees, rather than drainage per se. The language of Paragraph 14.1.7 is expansive enough to cover a dispute about the financial aspects of drainage rights. Westlands cites no language in the Judgment to contradict such an interpretation. The motion to dismiss as to these claims must be denied.[2]

## B. *Tort Claims*

The complaint seeks tort damages and equitable relief for claims sounding in negligence, trespass, nuisance, failure to discharge mandatory duties, and dangerous condition of public property. The core of Plaintiffs' injury claim is succinctly stated in paragraph 163: "Plaintiffs' soil has been rendered barren by excess salt. Plaintiffs' crops have been killed by water inundating the root zone."

### 1. Discretionary Immunity

■ Westlands contends that it is statutorily immune from Plaintiffs' tort claims as all of the alleged acts were performed within the discretionary power of its Board of Directors. The liability of state governmental entities for tort claims flows from the California Tort Claims Act, California Government Code §§ 810 *et seq.* Section 815 provides that a public entity is not liable for injury arising out of an act or omission except as provided

by statute. It also provides for the existence of statutory immunities. California Government Code section 820.2 states:

> Except as otherwise provided by statute, a public employee is not liable for an injury resulting from his act or omission where the act or omission was the result of the exercise of the discretion vested in him, whether or not such discretion be abused.

Section 815.2 of the Government Code provides, in relevant part:

> Except as otherwise provided by statute, a public entity is not liable for an injury resulting from an act or omission of an employee of the public entity where the employee is immune from liability.

Thus, if Westlands' board members would be entitled to immunity under § 820.2, so is Westlands itself. *See Wallace v. City of Los Angeles,* 12 Cal.App.4th 1385, 16 Cal.Rptr.2d 113 (1993).

As a preliminary matter, Plaintiffs cite *Lopez v. Southern California Rapid Transit District,* 40 Cal.3d 780, 221 Cal.Rptr. 840, 710 P.2d 907 (1985), for the proposition that Westlands' claim to discretionary immunity cannot be resolved on a motion to dismiss. In *Lopez,* a public corporation, which provided municipal bus service, argued that its bus driver's refusal to protect passengers from an assault by fellow riders was a decision entitled to discretionary immunity. The case does not state that a demurrer could not be sustained as a matter of law, but rather that the trial court erred in dismissing the case given the absence of facts regarding the driver's motivation and authority. *Id.* at 794, 221 Cal.Rptr. 840, 710 P.2d 907.

After *Lopez,* California appellate courts have affirmed dismissals based on a finding of discretionary immunity. *See Alicia T. v. County of Los Angeles,* 222 Cal.App.3d 869, 271 Cal.Rptr. 513 (1990) (affirming dismissal based on social worker's investigation of child abuse, since, as with prosecutor, task is discretionary, not ministerial); *Land Waste Management v. Contra Costa County Bd. of Supervisors,* 222 Cal.App.3d 950, 271 Cal.Rptr. 909 (1990) (affirming dismissal of tort

---

**2.** Plaintiffs concede that Paragraph 20 of the Judgment precludes them from seeking refund of

the $.50 per acre foot drainage service charges paid before December 30, 1986.

claims made against county board since adoption or refusal to adopt enactment and failure to issue or deny permit are discretionary tasks); *see also* Arvo Van Alstyne, *California Government Tort Liability Practice,* § 2.113 (3d ed. 1992) ("A defense of statutory immunity may properly be asserted by demurrer or motion for judgment on the pleadings in an appropriate case").

*Lopez* is helpful, however, in summarizing the holding of the leading case interpreting section 820.2, *Johnson v. State of California,* 69 Cal.2d 782, 73 Cal.Rptr. 240, 447 P.2d 352 (1968):

> In [*Johnson*], this court rejected a purely semantic approach to determining whether a given act is discretionary or ministerial, noting that any act, no matter how ministerial, involves some degree of "discretion" and judgment in the literal sense of those words. Instead, the *Johnson* court looked to the policy considerations underlying the grant of immunity for discretionary acts. The court concluded that section 820.2 confers immunity only with respect to those "basic policy decisions" which have been committed to coordinate branches of government, and does not immunize government entities from liability for subsequent ministerial actions, taken in the implementation of those basic policy decisions. This distinction is sometimes characterized as that between the "planning" and the "operational" levels of decision-making....
>
> Section 820.2 provides immunity only for the acts or omissions that are "the result of the *exercise* of the discretion" vested in a public employee. Therefore, the court in *Johnson* held that to avail itself of the discretionary immunity provided in section 820.2, a public entity must prove that the employee, in deciding to perform (or not to perform) the act which led to plaintiff's injury, *consciously exercised discretion* in the sense of assuming certain risks in order to gain other policy objectives. "[T]o be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place. The fact that an employee normally engages in 'discretionary activity' is irrelevant if, in a given case, the employee did not render a considered decision."

*Lopez,* 40 Cal.App.3d at 793–94, 221 Cal. Rptr. 840, 710 P.2d 907 (citations omitted, emphasis in original).

Paragraphs 166 through 168 of the complaint allege the following acts and omissions:

(1) The District misinterpreted the duties created under the 1985 Agreement.

(2) The District failed to diligently challenge the legality of the SWRCB Orders and abandoned any challenge to the SWRCB Orders.

(3) The District assumed the correctness of the opinion of the Federal Defendants under the Migratory Bird Treaty Act and ignored the incorrectness of the opinion.

(4) The District participated in the closing of the As–Built Drainage Collector System and the As–Built San Luis Drain.

(5) The District negligently performed its duty under the 1963 Service Contract to construct works necessary to protect the irrigability of plaintiffs' lands.

(6) The District negligently performed its duty under the 1965 Repayment Contract to accept the care, operation, and maintenance of the intra-district systems.

(7) The District negligently carried out its fiduciary duties to plaintiffs.

(8) The District negligently performed its duties under the *Barcellos* Judgment by failing to spend money with care for any drainage purpose, wasting $8,000,000 on unproductive studies and experiments, and in failing to cooperate in the development of a drainage plan.

(9) The District negligently focused on irrigating Area II, rather than draining Area I, by continuing water deliveries to most parts of Area II and initiating the $98,000,000 project.

Plaintiffs' allegations can be further summarized as focused on two events: 1) The water district's decision to enter into the April 3, 1985 Agreement, which resulted in the closure of the San Luis Drain and blockage of the collector system while delivery of irrigation water was continued; and 2) The

water district's decision to fund projects which failed to provide drainage but instead promoted the increased delivery of irrigation water.[3]

The alleged acts of the Westlands' Board fall squarely within the immunity provided under section 820.2, as interpreted by California courts. Westlands is vested by state law with the authority to enter agreements and make funding decisions. *See, e.g.,* Cal. Water Code § 35851 (authorizing the district to enter into contracts with the United States, "as the Board deems proper, advisable or in the interests of the district"); §§ 36455, 36455.2 (authorizing the district "in the discretion of the board of directors" to acquire and construct various works, and provide funding by levying assessments and issuing bonds). The alleged decisions made by the Board, the district's legislative body, were purely discretionary.[4] The Board's determination that it was better to agree to block existing drainage facilities than to risk losing both drainage and irrigation water delivery service in a legal battle with the State and the federal government was a "basic policy decision" which it was authorized to make. The decision to fund one project instead of another is similarly a purely legislative concern.[5] Section 820.2 makes these policy decisions unreviewable by the judicial branch. Allegations that these decisions were unwise, or even an abuse of the Board's discretion, do not diminish Westlands' entitlement to discretionary act immunity.

Plaintiffs cite to *Sandrini Brothers, Inc. v. Voss,* 7 Cal.App.4th 1398, 9 Cal.Rptr.2d 763 (1992), in which the court held that the Director of California's Department of Food and Agriculture was not immune under § 820.2 for damages suffered by a property owner resulting from a wrongful seizure of crops. The Director had acted pursuant to a state statute which provided that he may order contaminated crops seized. The court held that "[a] broad policy or planning decision is not involved" in the Director's choice as how to handle the crops. *Id.* at 1408, 9 Cal.Rptr.2d 763. Whether to seize the crops or choose an alternate course of action was merely a ministerial decision. *Id.* Here, the difficult and well-debated decisions to settle ongoing litigation by choosing to block drainage in exchange for continued water delivery and to fund delivery programs while allegedly abandoning the drainage program implicate broad policy choices rather than merely ministerial functions.

Westlands has provided the minutes of the Board meetings, which may be judicially noticed as public records in a motion to dismiss. The minutes confirm that these decisions are of the type contemplated in *Johnson.* "[T]o be entitled to immunity the state must make a showing that such a policy decision, consciously balancing risks and advantages, took place." *Johnson,* 69 Cal.2d at 795, 73 Cal. Rptr. 240, 447 P.2d 352.

The Board was aware prior to the April 3, 1985 Agreement that its access to irrigation water was threatened. At a March 18, 1985 Board meeting, President Jack Stone commented on ongoing negotiations with the Department of the Interior:

> Interior Secretary Donald Hodel has instructed his people to try to find a way to continue irrigation water service in the drainage service area of Westlands during the 1985 season. Westlands is very hopeful that agreement will be reached at the

---

3. Plaintiffs' other tort claims are based on the same factual allegations: they have incurred injury due to Westlands' acts in continuing delivery of irrigation water without provision for drainage.

4. *Cf. Land Waste Management v. Contra Costa County Bd. of Supervisors,* 222 Cal.App.3d 950, 271 Cal.Rptr. 909 (1990) (county board's decisions regarding adoption of proposed enactment and issuance of permit discretionary tasks).

5. *Cf. Roseville Community Hospital v. State of California,* 74 Cal.App.3d 583, 141 Cal.Rptr. 593 (1977) (decision by attorney general to allocate

financial resources to law enforcement activities in certain area to exclusion of others discretionary); *see also* Arvo Van Alstyne, *California Government Tort Liability Practice,* § 2.119 (3d ed. 1992) ("A governmental decision involving essentially political considerations is regarded as 'discretionary' and thus immune from liability. The category of political decisionmaking includes questions of budgetary and fiscal policy, personnel administration standards, allocation of available resources according to variable priorities of need, and choices between competing plans for accomplishing approved objectives.")

Sacramento meeting, which was arranged by Congressman Tony Coehlo. At the same time, the primary responsibility of the District is to its landowners and farmers who face bankruptcy and financial ruin if irrigation water is terminated. Consequently, the Board has authorized District staff to continue preparing appropriate legal action to maintain water deliveries to be filed in the event agreement cannot be reached at the Sacramento meeting today.

Minutes of March 18, 1985, Ex. 11, Westlands' Supplemental Request for Judicial Notice. The Board was also apprised of the "risks and advantages" involved in its later decision to plug the drainage collector system. In responding to criticism of the plan, William Johnston made the following statement on behalf of Westlands:

> ... Westlands is very much aware of the potential impacts if the 42,000–acre drainage service area were to go out of production. In fact, those adverse impacts were a primary reason the District entered into the April 3, 1985, Agreement with the Department of the Interior. Had it not been for that agreement, irrigation water deliveries would have ceased, agricultural production would have been drastically reduced, if not eliminated during 1985 and those adverse impacts would have long since occurred.
>
> We do not believe that plugging the drains will cause any significant loss of agricultural production for at least five, and perhaps ten years. Therefore, we do not expect that the impacts presented as a "worst case scenario" in the [environmental impact report] will actually occur, if it can find an economical and environmentally safe means to dispose of subsurface drainage. *At the same time, the District finds the prospect of plugging the drainage system extremely distasteful and is only proposing this action because of the firm commitment to terminate the drainage flows by June 30, 1986, and because all other efforts have not and very likely cannot eliminate drainage flows.*

December 16, 1985 Minutes (emphasis added), Ex. 12, Westlands' Supplemental Request for Judicial Notice.

The minutes also demonstrate that funding decisions were discussed by the Board. *See, e.g.,* August 18, 1986 Minutes, Ex. 13, Westlands' Supplemental Request for Judicial Notice (discussing decision to fund experimental alternate drainage plans); February 23, 1989 Minutes, Ex. 13, Westlands' Supplemental Request for Judicial Notice (discussing funding of "Prototype Deep Well Injection Project").

Westlands has met its burden of establishing that the Board, in deciding to act in a manner which led to Plaintiffs' alleged injury, "consciously exercised discretion in the sense of assuming certain risks in order to gain other policy objectives." *Lopez,* 40 Cal.3d at 794, 221 Cal.Rptr. 840, 710 P.2d 907.

A determination that immunity exists under § 815.2 does not extinguish all of Plaintiffs' tort claims. The court in *Bradford v. State of California,* 36 Cal.App.3d 16, 21, 111 Cal.Rptr. 852 (1973) held:

> [T]he fact that derivative liability under section 815.2 may be nullified by an employee immunity in no way affects direct liability based on section 815.6. Such liability could only be negatived by a statutory entity immunity. We know of none.

(citation and footnote omitted). Plaintiffs' claim under Government Code section 815.6 for breach of a mandatory duty survives, regardless of any decision as to discretionary act immunity.

Plaintiffs' tort claim for dangerous condition of public property, based on Government Code section 835, is similarly unaffected by discretionary act immunity. *See* Arvo Van Alstyne, *California Government Tort Liability Practice,* § 2.12 (3d ed. 1992) ("the provisions of the Act imposing liability for dangerous conditions of public property are manifestly designed to be applied without reference to the discretionary immunity rule") (citing by implication, *Baldwin v. State of California,* 6 Cal.3d 424, 99 Cal.Rptr. 145, 491 P.2d 1121 (1972).

Plaintiffs cite *Nestle v. City of Santa Monica,* 6 Cal.3d 920, 101 Cal.Rptr. 568, 496 P.2d 480 (1972) for the additional proposition that statutory immunity pursuant to § 815.2 has no impact on their nuisance claim. Yet,

726

*Nestle* simply states that a cause of action for nuisance against a governmental entity arises outside of the Tort Claims Act, specifically under Civil Code section 3479. That is, tort liability can exist even where section 815 appears to grant general immunity to government entities for any tort not named within the Tort Claims Act. *Nestle* does not hold that specific statutory immunities found within the Tort Claims Act are inapplicable to a nuisance claim. *See* Arvo Van Alstyne, *California Government Tort Liability Practice,* § 3.110 (3d ed. 1992) ("While the general immunity of [section 815] does not bar nuisance actions against public entities to the extent that such actions are founded on [section 3479] or other statutory provisions, the statutory immunities provided in the Tort Claims Act may be applicable as defenses to the public entity when sued on a nuisance theory"). In *Mikkelsen v. State of California,* 59 Cal.App.3d 621, 130 Cal.Rptr. 780 (1976), the use of the statutory immunity provided under Government Code section 830.6 was upheld in a nuisance suit. Plaintiffs provide no case holding that discretionary act immunity, as provided under section 820.2, is not similarly applicable to defend against a nuisance claim.

The result of applying the discretionary act immunity statute to Plaintiffs' tort claims is that all allegations sounding in negligence, trespass, and nuisance must be dismissed with prejudice. The claims for failure to discharge a mandatory duty and dangerous condition of public property remain to be analyzed.

### 2. Breach of Mandatory Duty Claim

Government Code § 815.6 provides that:

Where a public entity is under a mandatory duty imposed by an enactment that is designed to protect against the risk of a particular kind of injury, the public entity is liable for an injury of that kind proximately caused by its failure to discharge the duty unless the public entity establishes that it exercised reasonable diligence to discharge the duty.

Thus, a three-pronged test must be satisfied to establish a prima facie basis for liability:

(1) An enactment must impose a mandatory, not discretionary, duty; (2) The enactment must be intended to protect against the kind of risk of injury suffered by the plaintiff; and (3) The breach of the mandatory duty must be a proximate cause of the plaintiff's injury. *See State of California v. Superior Court,* 150 Cal.App.3d 848, 854, 197 Cal.Rptr. 914 (1984); Arvo Van Alstyne, *California Government Tort Liability Practice,* § 2.71 (3d ed. 1992).

Westlands argues that the first requirement is absent as the complaint fails to sufficiently allege the breach of any applicable statute or regulation which imposes a mandatory duty. The court in *Lehto v. City of Oxnard,* 171 Cal.App.3d 285, 292, 217 Cal. Rptr. 450 (1985), held that "[b]ased upon the manifest intent underlying section 815.6, we think it obvious that a litigant seeking to plead the breach of a mandatory duty specifically allege the applicable statute or regulation."

Plaintiffs contend paragraph 170 is sufficient:

The District was under mandatory duties imposed by various enactments, including the Merger Law and the California Water District Law, which were designed to protect the Area I landowners and water users against certain risks. The District's failure to discharge those duties caused plaintiffs' injuries of such type. The District failed to exercise reasonable diligence to discharge such duties.

Plaintiffs suggest that Westlands knows that "Merger Law" refers to California Water Code §§ 37800 through 37856, and Water Code § 37856 provides:

Lands which were within the Westlands Water District immediately prior to the merger shall, so long as said lands remain in the said District, have a prior right with respect to water to which said District was entitled under any contract with the United States in effect on the date of said merger over (1) lands added to the Westlands Water District as a result of the merger and (2) lands annexed to said District subsequent to the merger.

Plaintiffs' position is problematic: (1) Paragraph 170 does not refer to § 37856, nor any specific statute as required by *Lehto;* (2) § 37856 speaks of Area I's priority rights to water *delivery,* it appears to impose no duty regarding *drainage;* (3) Paragraph 170 alleges mandatory duties under "California Water District Law," yet Plaintiffs now make no allegation as to that body of law (except the reference to "Merger Law" which is a subset of "Water District Law"); and (4) Paragraph 170 states that "mandatory duties exist under various enactments" other than those contained in "the Merger Law and the California Water District Law," yet Plaintiffs do not identify the duties, not their source.

Allegations of a breach of a mandatory duty must be pleaded with specificity. Plaintiffs' overbroad assertions shall be dismissed with leave to amend.

### 3. Dangerous Condition of Public Property Claim

██ Government Code section 835 provides the basis for liability for an injury caused by the dangerous condition of public property. The first necessary step in establishing a prima facie claim is to demonstrate that the public property was in a dangerous condition at the time of the injury. Westlands asserts that Plaintiffs' claim is defective by failing to allege the existence of a dangerous condition in any property owned or controlled by Westlands.

Paragraph 171 of the complaint alleges:

Real and personal property owned or controlled by the District, including the As-Built Drainage Collector System and the distribution system in Area II, was in such condition as to create a substantial risk of injury when used with due care in a manner reasonably foreseeable to be used. Said condition created a reasonably foreseeable risk of and caused plaintiffs' injuries. Negligent or wrongful acts or omissions of the actions of District employees within the scope of employment created such condition. The District has actual or constructive notice of such condition and had the opportunity to take measures to protect against such condition.

Section 830(a) defines "dangerous condition" as "a condition of property that creates a substantial (as distinguished from a minor, trivial, or insignificant) risk of injury when such property or adjacent property is used with due care in a manner in which it is reasonably foreseeable that it will be used." Westlands argues that neither the drainage collector system nor the water delivery system is or ever was a dangerous condition. Nor can the drainage collector system be the source of a risk of injury in its present inoperable state. Westlands notes that Plaintiffs do not allege any injury caused by the drainage system when it was being operated. Westlands argues that Plaintiffs cannot show that the water delivery system in Area II is a dangerous condition, as it only delivers water. It further contends that Plaintiffs' resentment that funds they assert should have been used to construct drainage facilities were instead allegedly used to build Area II's delivery system does not make the delivery system dangerous.

Plaintiffs' theory of harm does not separate the drainage collector system and the water delivery system. Their claim is said to apply to the delivery and drainage system as a whole (the "as-planned irrigation system"); the irrigation system was intended to operate as a single unit, to bring irrigation water into Westlands and remove the excess. They allege the system, as it currently operates, is "defective *per se,*" because it brings water in, but provides no means to remove the excess. This lack of drainage is a dangerous condition which harms their lands.

██ A dangerous condition can exist even if the public property is not defective, where other independent acts occur which cause the injury to occur. Arvo Van Alstyne, *California Government Tort Liability Practice,* § 3.16 (3d ed. 1992) states that beyond the obvious cases in which the public property is physically flawed,

"Condition of property" also has been defined as public property that is not damaged or in a deteriorated condition, and that is neither structurally unsound nor physically defective. Such property may nevertheless be in a dangerous condition because of the design or location of the

improvement, the interrelationship of its structural or natural features, or the presence of latent hazards associated with its normal use.

*Id.* at 308. The treatise refers to cases that establish that an otherwise non-dangerous condition (*e.g.,* providing water delivery) can be termed dangerous because of the occurrence of an independent act (*e.g.,* blockage of drains). *See Hill v. People ex rel. Dept. of Transp.,* 91 Cal.App.3d 426, 154 Cal.Rptr. 142 (1979) (a nondefective highway overpass rendered dangerous by a negligently issued oversize load permit that routed a truck through the overpass); *Anderson v. City of Thousand Oaks,* 65 Cal.App.3d 82, 135 Cal. Rptr. 127 (1976) (a sharp curve incorporated into a highway improvement without signs posted warning of the need to reduce speed); *Branzel v. City of Concord,* 247 Cal.App.2d 68, 55 Cal.Rptr. 167 (1966) (a nondefective model airplane flying in close proximity to high voltage power lines).

■ The determination of whether a condition is dangerous is generally one of fact for the jury. *Peterson v. San Francisco Community College Dist.,* 36 Cal.3d 799, 810, 205 Cal.Rptr. 842, 685 P.2d 1193 (1984). The issue can only be determined as a matter of law if reasonable minds can come only to one conclusion. *Mittenhuber v. Herrera,* 142 Cal.App.3d 1, 5, 190 Cal.Rptr. 694 (1983).

Given the plain language of section 830(a) and the absence of any case law to the contrary, Plaintiffs' dangerous condition of public property claim survives. If a city provided water service to a block of privately owned homes with sewer pipes that all led to the house at the end of the block, knowing that sewage service to the block had been shut off, a dangerous condition could exist, regardless of the fact that neither the water service nor the inoperative sewage system is independently dangerous.

The motion to dismiss is denied as to this claim.

### 4. Compliance with Tort Claims Act

In the Court's October 30, 1991 Order, the tort and contract claims of 97 plaintiffs were dismissed with leave to amend because the complaint did not allege timely compliance with the administrative claims requirements of California's Tort Claims Act. The amended complaint names 147 plaintiffs. Westlands alleges that many of these monetary relief claims must be dismissed for lack of compliance with the timing requirements of the Tort Claims Act.

Plaintiffs and Westlands agree that the pool of plaintiffs can be divided into five categories (termed 1, 2, A, B, and C, in the parties' briefs; numbered consecutively here):

Group One consists of 49 plaintiffs, all of whom filed administrative claims in May or June of 1986 in their own names. Westlands acknowledges that these plaintiffs were granted extensions to January 31, 1991, for the filing of suit on their administrative claims.

Group Two consists of 4 plaintiffs who filed claims dated March 17, 1989 and May 9, 1990.

Group Three consists of 4 plaintiffs (Kriesant Operating Company, Inc., TIMCO, Donald Skinner et al., dba Murrieta Landowners, and Lionel Caeton) who filed claims in May and June of 1986 in their own names. Westlands contends that they were not subsequently granted extensions for the time in which to file suit.

Group Four consists of 49 plaintiffs, all of whom are members of the Allen, Britz, Carvalho, Kriesant, Wolfsen, and Thomsen families, each of whom is alleged by Plaintiffs to be either "the successor-in-interest, transferee, or assignee of a named claimant, a party on behalf of whom an administrative claim was filed, or is otherwise entitled to bring suit thereunder." It is alleged that a family member or corporate entity of which the plaintiff was a principal filed a claim in 1986, yet not in the plaintiff's name.

Group Five consists of 42 plaintiffs, all of whom are members of the Peck, Guenther, Orff, O'Neill and Walton families. Plaintiffs allege that they own land which was never served by the collector drainage system. They filed administrative claims on April 5, 1991.

Westlands concedes that members of Groups One and Two are proper plaintiffs to claims seeking money damages. It contends that such claims may not be raised by members of Groups Three, Four, and Five.

■ As to Group Three, there is no dispute that their administrative claims were filed in a timely manner. The dispute is over whether Westlands granted an extension of time in which to file suit. Westlands contends that it sent out extension letters which became effective only upon the recipient signing and returning a copy of the letter. Westlands alleges that such letters were sent to the Group Three plaintiffs, but the letters were not returned.

Westlands has asked that judicial notice be taken of the "Third Declaration of Mary K. Alderson" in which Ms. Alderson states that a series of five extension letters (one each year from 1986 through 1990) were sent to those who had filed administrative claims, but that at various stages each of the Group Three plaintiffs failed to return a signed extension letter. In a document entitled "Sumner Peck Plaintiffs' Request to Exclude Evidence Presented By Westlands Water District," Plaintiffs object that the subject matter of the Alderson Declaration is not of the type for which judicial notice may be taken. They also object on evidentiary grounds. They additionally contend that insufficient discovery has occurred to fairly allow the motion to dismiss to be transformed into one for summary judgment. They have also submitted declarations of the Group Three plaintiffs which contradict the Alderson Declaration. Given the complexity of Westlands' motion and the stay of discovery, Plaintiffs are justified in seeking to prevent the introduction of non-pleading evidence. In any case, the existence of factual disputes prevents the dismissal of Group Three plaintiffs.

■ The Group Four plaintiffs have not filed an administrative claim, yet allege that they have standing to sue as successors-in-interest of family members who timely filed claims.[6] Westlands alleges that suit may only be initiated by plaintiffs whose names actually appear on the underlying administrative claims. It notes that California Government Code Section 910 requires that "[a] claim shall be presented by the claimant or a person acting on his behalf ..." Section 910.2 similarly requires that "[t]he claim shall be signed by the claimant or by some person on his behalf." Yet these statutes do not explicitly bar a successor-in-interest from filing suit on the basis of a properly filed claim. The case law Westlands cites is distinguishable from the present situation. In those cases, the plaintiffs attempted to either change the nature of the injury asserted or expand the recovery sought. In each case, the government would have suffered potential prejudice, by either having to defend against a new theory or be exposed to increased liability. *See Roberts v. State of California,* 39 Cal.App.3d 844, 848, 114 Cal. Rptr. 518 (1974) (filing requirement for widow suing for wrongful death not satisfied by worker's compensation claim filed by insurer and employer, since state's "exposure is different in kind and nature"); *Pacific Tel. & Tel. Co. v. County of Riverside,* 106 Cal. App.3d 183, 191, 165 Cal.Rptr. 29 (1980) (filing requirement for widow suing for wrongful death not satisfied by workers' compensation claim filed by employer, citing rationale of *Roberts*); *Lewis v. City and County of San Francisco,* 21 Cal.App.3d 339, 341, 98 Cal.Rptr. 407 (1971) (filing requirement for widower suing for wrongful death. not satisfied by personal injury claim filed by decedent since "action for wrongful death is wholly distinct"); *Petersen v. City of Vallejo,* 259 Cal.App.2d 757, 765–66, 66 Cal.Rptr. 776 (1968) (filing requirement for daughter suing for wrongful death of father not satisfied by wrongful death claim made by still living mother where daughter could have filed claim at same time and each survivor has independent cause of action in wrongful death suit); *Bozaich v. State of California,* 32 Cal.App.3d 688, 697, 108 Cal.Rptr. 392 (1973) (class action cannot be instituted when

---

**6.** The sole exception to the transfer of land to family members involves Kriesant Operating Company, Inc., which filed an administrative claim in 1986 for 1268 acres of land. Plaintiffs allege that in 1988, 320 of these acres were distributed to the corporation's principal, Carl J.E. Kriesant, in his individual capacity and as trustee. The analysis appears to be unchanged.

**730**

only two plaintiffs filed administrative claim since allowing "an unascertainable number of claimants whose properties allegedly were taken by the state over the years" would "erode the very foundation upon which the claim-filing statutes rest").

All of the cases Westlands cites were discussed and rejected in *San Diego Unified Port Dist. v. Superior Court,* 197 Cal.App.3d 843, 243 Cal.Rptr. 163 (1988). *San Diego Unified* involved the factual opposite of *Roberts;* a worker had filed an administrative claim based on personal injury but her employer's workers' compensation insurer had failed to file a reimbursement claim. The court began by noting:

> There are two purposes for the filing requirement: (1) to give notice to the public entity so it will have a timely opportunity to investigate the claim and determine the facts; and (2) to give the public entity an opportunity to settle meritorious claims thereby avoiding unnecessary lawsuits.

*Id.,* 39 Cal.App.3d at 847, 114 Cal.Rptr. 518. The court concluded that the governmental entity could not have been prejudiced by the insurer's failure to file a claim as plaintiff's claim for damages was "all-inclusive." *Id.* at 848, 114 Cal.Rptr. 518. It was also clear that the governmental entity's decision not to settle with plaintiff was not affected by the insurer's failure to file a claim. *Id.* The court rejected *Petersen* and *Bozaich* as inapplicable as "[b]oth cases involved prospective claimants with separate claims and additional claims" and *Roberts* and *Pacific Telephone* as distinguishable because the initial claim left the "extent of potential damages ... unknown to the entity" and "the entities' posture on settlement may have been signifi-

cantly different." *Id.* at 851, 114 Cal.Rptr. 518.

Westlands argues that *San Diego Unified* is factually distinguishable as it involves a subrogation relationship and relies on workers' compensation statutes.[7] While this is true, the logic employed by the case is relevant: a governmental entity must demonstrate that it would be prejudiced by the failure of a successor-in-interest to file an administrative claim.

Westlands would not be prejudiced by allowing the Group Four claims to go forward.[8] The Group Four plaintiffs are alleging the same issues and injuries as raised in the claims filed by their predecessors-in-interest. Westlands does not contest Plaintiffs' allegation that the identical acreage is at issue now as in 1986, when the claims were filed. The land has simply been divided up within the families. Westlands does not argue that Group Four's failure to file negatively affected the district's ability to settle the case. Westlands' dealings with Group One, indicate that the district made the tactical decision not to settle with any party.

■ The Group Five plaintiffs acknowledge that they did not file administrative claims until April 5, 1991. They allegedly own land which was never served by the collector drainage system. The parties disagree as to whether these claims are timely and the time period for which Plaintiffs can seek damages.

Westlands argues that the Group Five plaintiffs were required to file a claim at the time any alleged injury occurred. Plaintiffs correctly point out that their claim for dangerous condition of public property is susceptible to a continuing tort theory. "If the injury is of a continuing nature, such as a

7. *See also,* Van Alstyne at 640 ("Even though another party may have presented a claim that provided full information to the entity about the alleged basis of liability, which is fully applicable to plaintiff as well, plaintiff's failure to present a timely claim on his or her account or to ensure that his or her claim is included in the presentation made by the third person will bar plaintiff's action"). Yet none of the cases the treatise cites discusses a situation where the plaintiff could not join in "the presentation made by the third person," because he or she held no ownership interest at the time.

8. At hearing, Westlands suggested that it would be prejudiced by the fact that it had not conducted discovery as to the lands owned by the Group Four claimants. It is not apparent why Westlands would have excluded these lands from its discovery procedure, as administrative claims were filed as to these lands by the claimants' predecessors-in interest. In any case, Westlands may seek additional time to conduct discovery as to these claims if it should become necessary.

prolonged flooding of land, the owner may treat the claim as one that keeps accruing from time to time and present periodic claims as the damage persists, or may treat the entire sequence of events as the occurrence from which the claim arose and compute the time for claims presentation from the last event in the series." Arvo Van Alstyne, *California Government Tort Liability Practice*, § 6.43 (3d ed. 1992) (citations omitted). A claimant may only recover for damage incurred within the period provided for filing claims.[9] *See Amador Valley Investors v. City of Livermore*, 43 Cal.App.3d 483, 490–91, 117 Cal.Rptr. 749 (1974) (damages only recoverable if they were incurred one year before the claim was filed).

The claims of Groups One through Four are viable. Group Five's claims are limited by the applicable statutes of limitations under the continuing tort theory.

## C. Breach of Contract Claims

The eighth cause of action alleges that Westlands has breached the 1963 Service Contract, the 1965 Repayment Contract, the contracts relating to the merger of the former Westlands and the original Westlands, and the 1986 Stipulated Judgment. It seeks money damages and appropriate equitable relief for such breaches.

### 1. Have Plaintiffs Stated a Claim in their Role as Third Party Beneficiaries

 Westlands contends that the complaint fails to allege a cognizable claim for breach of the 1963 Service Contract [10] and the 1965 Repayment Contract.[11] Westlands makes no arguments as to the claims arising from the other alleged contracts. Both Westlands and Plaintiffs agree that Plaintiffs are third-party beneficiaries to the 1963 and 1965 contracts between the United States and Westlands. "The rights of third-party

beneficiaries are limited by the contract between the promisor and the promisee." *Punikaia v. Clark*, 720 F.2d 564, 570 (9th Cir.1983). As Plaintiffs cannot state a contract claim against Westlands for alleged promises made by the United States, Plaintiffs' claims are limited to those rights which the United States could assert against Westlands under the two contracts. Westlands contends that Plaintiffs have no claims as to the provision of drainage service because the United States could not state a cognizable claim for breach under either of the contracts.

Plaintiffs' claim as to the 1963 Service Contract focuses around Article 13 which provides that Westlands "shall construct such drainage works as are necessary to protect the irrigability of lands within the District." The term "drainage works" is not defined. Plaintiffs would define the term broadly, so as to impose on Westlands the duty to build whatever facilities are necessary to protect irrigability, regardless of the federal government's subsequent refusal to provide any portion of the drainage. That is, since the federal government decided to shut down the interceptor drain and the disposal site, Westlands owes a contractual duty to the federal government, and thus to Plaintiffs, to construct an entire alternate drainage system.

Yet, paragraph (g) of the contract demonstrates that the parties to the contract did not intend that the obligation owed by Westlands be so broad. It provides, "[d]rainage facilities of the District constructed in accordance with Article 13 hereof may be connected to the interceptor drain in such capacity and at such location as may be mutually agreed upon by the District and the United States." Thus the only logical interpretation of the two contractual provisions is that the "drainage works" contemplated under Article 13 refers to the intra-district drainage collec-

---

9. To the extent that Plaintiffs are alleging damages to real property, a one year limitation period is applicable. Cal.Govt. Code § 911.2. If they are also alleging "injury to growing crops," a six-month limitation period applies. *Id.* "[T]wo claims arising out of the same wrongful act or omission may be subject to different claims-presentation periods." Van Alstyne at 689.

10. Exhibit 9 of Plaintiffs' Request for Judicial Notice, filed on August 1, 1991.

11. Exhibit 10 of Plaintiffs' Request for Judicial Notice, filed on August 1, 1991.

tor system. It cannot refer to the interceptor drain, as the works in question are to "be connected to the interceptor drain." Nor is there any suggestion that it refers to the disposal site at the terminus of the interceptor drain. Thus, the United States could not maintain a breach of contract action against Westlands for its failure to provide any more than an intra-district drainage collection system. Nor can Plaintiffs, as third-party beneficiaries to the contract, maintain such an action.

Thus narrowed, the question becomes whether the United States could maintain a contract action against Westlands for its failure to provide a drainage collector system. Westlands argues that such an action could not be maintained because the United States, by shutting down the interceptor drain, has made performance of the District's obligation impossible. Westlands contends that it cannot provide drainage because there is no place for the water to go.

Westlands is correct that the United States could not now bring such a suit. Yet, it is not clear that the United States *never* could have brought such a suit. The *Barcellos* Judgment appears to have modified the terms of the 1963 Service Contract as to the parties' respective drainage obligations. The rights of a third-party beneficiary are not always affected by the subsequent acts of the contracting parties. As Witkin states:

> [I]n the absence of a contract term limiting their power, the promisor and promisee "retain power to discharge or modify the duty by subsequent agreement." The power terminates, however, when the beneficiary, before receiving notification of the discharge or modification, "materially changes his position in justifiable reliance on the promise or brings suit on it or manifests assent to it at the request of the promisor or promisee." And if the promis-

ee receives consideration for an attempted discharge or modification which is ineffective against the beneficiary, "the beneficiary can assert a right to the consideration so received."

B.E. Witkin, 1 *Summary of California Law*, § 671 (9th ed.1987). Westlands' motion to dismiss Plaintiffs' claim for breach as to the 1963 Service Contract must be denied, as the effect of the modification on Plaintiffs' rights cannot be determined from the pleadings or the present record.[12]

As to the 1965 Repayment Contract, Plaintiffs allege that language within Articles 2 and 7 imposes a duty on Westlands.[13] Plaintiffs specifically point to Article 2(a) which provides that "[t]he United States and the District will exert their best efforts to expedite the completion" of the "distribution system" which the United States will pay for. A similar provision in Article 7 obligates Westlands to "use all proper methods to secure the economical and beneficial use of the water delivered by means of the distribution system." Article 1(d) defines "distribution system" to include "a drainage collector system."

While conceding that Plaintiffs are third-party beneficiaries under the 1965 contract,[14] Westlands argues,

> The intent of each of these provisions is to set forth general conditions, for the mutual benefit *of the contracting parties.* These provisions are intended to guide and define the relationship of the parties in carrying out a complex undertaking. They were not intended to grant third-parties the right to sue for perceived failures of mutual agreement, effort, consultation, or cooperation.

(emphasis in original). Westlands miscites a 1978 case from the Northern District of Mississippi, *Ivey's Plumbing and Elec. Co. v.*

---

**12.** At oral argument, Westlands asserted that Plaintiffs are estopped from relying on contractual rights which the United States may have forsaken in the *Barcellos* Judgment because Plaintiffs were full participants in, and third-party beneficiaries to, the *Barcellos* Judgment. Westlands' assertion involves consideration of factual issues beyond the scope of a pleading motion.

**13.** At oral argument, Plaintiffs stated that Article 4(b), as alleged in paragraph 54 of the complaint, also imposes duties on Westlands regarding drainage. The language of Article 4 quoted in paragraph 54 obligates Westlands to repay the government for water facilities. It imposes no drainage duties on the water district.

**14.** *See* Westlands' Reply brief at p. 26, n. 26.

*Petrochem Maintenance, Inc.*, 463 F.Supp. 543 (N.D.Miss.1978), for the proposition that a party can be a third-party beneficiary of some portions of a contract, but not for others. The intent that Westlands ascribes to the parties cannot be determined from the language of the contract, and the issue cannot be determined on a pleading motion.

## 2. Compliance with Tort Claims Acts

██ Westlands contends that the breach of contract claims as to some of the plaintiffs must be dismissed as their administrative claims failed to "state any direct or inferential facts in support of their contract claim for relief." It alleges this deficiency as to all but 23 of the plaintiffs who filed an administrative claim in 1986. Plaintiffs respond that the facts alleged in all of the claims put Westlands on adequate notice of the claimants' intent to assert a claim for breach of contract.

Copies of the administrative claims are contained in Westlands' Request for Judicial Notice, filed on June 17, 1991. Judicial notice can be taken of these public records. A document entitled "Supplemental Declaration of Mary K. Alderson, filed April 20, 1992, lists the 23 claims which Westlands concedes adequately state a contract claim. Review of those claims reveal that in each case it is alleged that harm has been caused by the plugging of the drains and that contracts exist which were breached by Westlands. For instance the May 26, 1986 claim of members of the Silveira family states in part:

*Circumstances:* On or about [March 10, 1986] subsurface drainage lines were first plugged which had the effect of preventing the removal of subsurface waters from property owned and farmed by claimants in Western Fresno County. Because of the plugging of the sub-surface drainage lines the production capability and value of the farm land immediately lowered in value.

*Contentions* ... That certain contracts were entered into between the Westlands Water District and other entities, of which claimants were third-party beneficiaries. By failing to enforce performance by the other entities to the various contracts, Westlands Water District has caused the damage and injury to claimants to which this claim is addressed.

Administrative Claim of various members of the Silveira Family, Westlands' Request for Judicial Notice, Ex. 1.

Review of a few of the administrative claims which Westlands contends fail to allege facts establishing a cause of action for breach demonstrates that the allegations of breach are not clearly stated. For instance, the claim of Linda Britz Glassman, filed June 5, 1986 states:

This claim arises from the shutting-off of the drainage pumps and the installing of earthen plugs in the drainage collector system in the area in which the Claimant's property is located. The shutting-off of the pumps and the installing of the plugs began on or about March 10, 1986, and adversely affects Claimant's attempts to mitigate damage by recycling, the shutting-off of the pumps and the installing of the plugs will cause the underground water table to rise; and if the water table rises, phytotoxic elements, including but not limited to sodium, chlorides, and boron, will increase, will reduce crop productivity, and in turn will reduce the fair market value of the property.

The shutting-off of the drainage pumps and the installing of the earthen plugs is a taking of the Claimant's property without just compensation (inverse condemnation), is tortious, and violates express and implied covenants between Claimant and the District.

The dollar amount claimed may increase with the passage of time.

Administrative Claim of Linda Britz Glassman, Westlands' Request for Judicial Notice, Ex. 1.

Another claim, filed by Robert Chuck, on June 4, 1986, is even more attenuated:

On or about the end of March 1986, Westlands Water District willfully and wrongfully constructed a drain plug on the drainage collector system serving the property described below ...

Such actions were taken by Westlands Water District with knowledge that prop-

erties would thereafter be unable to adequately drain irrigation water and that such actions would result in loss of the ability to continue to farm such property, loss in value of the property, and loss of profits such farming activities on the property.

Administrative Claim of Robert Chuck, as Trustee, Westlands' Request for Judicial Notice, Ex. 1.

"When a civil action is brought following denial of a government tort claim 'the written claim must correspond with the facts alleged in the complaint; even if the claim were untimely, the complaint is vulnerable to a demurrer if it alleges a factual basis for recovery which is not fairly reflected in the written claim.'" *Blair v. Superior Court*, 218 Cal.App.3d 221, 223–24, 267 Cal.Rptr. 13 (1990) (citation omitted). Government Code section 910,

> prescribes the information that the claim must contain. As pertinent here, the statute requires that the claimant set forth: "(c) The date, place, and other circumstances of the occurrence or transaction which gave rise to the claim asserted. (d) A general description of the ... inquiry, damage or loss incurred.... (e) The name or names of the public employee or employees causing the injury ... if known." *As long as these general elements are present, it is not necessary that the claim comply with formal pleading standards. The purpose of the claim is to present sufficient detail "to reasonably enable the public entity to make an adequate investigation of the merits of the claim and to settle it without the expense of a lawsuit."* ...
>
> ... *While an allegation as to the legal cause of an accident may be an element of the tort which must be pled in a complaint, section 910 does not impose upon an injured claimant an obligation to include it in the claim.*

*Blair*, 218 Cal.App.3d at 224–25, 267 Cal. Rptr. 13 (citations omitted, emphasis added).

The administrative claims filed in 1986 gave Westlands sufficient notice of the injury alleged, namely that the water table had risen as a result of plugging the drainage collector system thereby causing harm to claimants' lands and crops. Whether plaintiffs now proceed under a tort theory or contract theory, the underlying factual basis for their claims is identical. The only unalleged fact in those claims which Westlands challenges is the existence of the contracts themselves. Westlands cannot establish that it was in any way prejudiced by this, as the claims filed by other landowners clearly alleged the existence of contractual rights and such rights were at the heart of the *Barcellos* litigation, which was settled prior to the drains being plugged. Neither the district's ability to investigate nor its settlement position was adversely affected by the lack of specificity of the claims.

The motion must be denied as to these administrative claims.

### D. *Inverse Condemnation Claims*

■ Plaintiffs' ninth claim asserts that Westlands has taken, and damaged, Plaintiffs' property for public use, but has failed to pay just compensation under the California and United States Constitutions.

In the Court's October 21, 1991 Order, Plaintiffs were directed that any future claim as to inverse condemnation should "focus on the conduct that ... effects a taking." Plaintiffs' new inverse condemnation claim alleges a new factual basis. The former complaint alleged that Westlands misused the existing, but non-operating, drainage system. The weakness of Plaintiffs' allegations was an inability to show that Westlands constructed or maintained the interceptor drain or Kesterson Reservoir. While Westlands operated the collector system, the collector system was arguably not the cause of Plaintiffs' alleged injury, the interceptor drain was. Even if the collector drain was returned to operation, Plaintiffs' land would continue to be damaged as the collector system would have no outlet through the closed interceptor drain.

Plaintiffs' new theory basically ignores the drainage system as it now exists in its non-operational state and concentrates on the alleged harm caused by the delivery of irrigation water to upslope lands, given the absence of drainage for their downslope lands:

The focus of these allegations is that the operation of the District's defective irrigation system which delivers millions of acre feet of water to upslope Area II lands, but does not drain the damaging subsurface saline water resulting from such deliveries, is a substantial causative factor of plaintiffs' drainage problems. The system was planned to include drains, but it is not being operated as planned.

As a preliminary matter, Westlands contends that Plaintiffs cannot complain about the damage being done to their lands by irrigation water when Plaintiffs demand that Westlands deliver the water to Plaintiffs. Westlands contends that the cases Plaintiffs cite for the proposition that a governmental entity is liable for failure to avert flood damage are inapposite as "[c]ommon sense suggests that a flood victim would not demand that the flooding continue." Yet, Plaintiffs are not demanding that water deliveries continue to Area II. Although Plaintiffs cannot collect for injury they have invited, they are not barred from seeking recovery for injury forced upon them.

Westlands contends that to maintain a claim for inverse condemnation, Plaintiffs must plead the existence of four conditions: a compensable property right; actual physical damage to real property proximately caused by a public improvement as deliberately designed and constructed; ownership, control, or substantial participation in the planning of the public improvement causing damage, and; a substantial cause-and effect relationship which excludes the probability that other forces alone produced the injury.

Westlands cites *Belair v. Riverside County Flood Control Dist.*, 47 Cal.3d 550, 558, 253 Cal.Rptr. 693, 764 P.2d 1070 (1988), for the statement, " '[t]he decisive consideration is whether the owner of the damaged property if uncompensated would contribute more than his proper share to the public undertaking.' " It contends that Plaintiffs cannot allege any public undertaking by Westlands which requires them to contribute more than their proper share of the burden. Yet, the public undertaking alleged is Westlands' delivery of irrigation water to its landowners. The undue burden alleged by Plaintiffs is in having their lands and crops injured by the accumulation of excess irrigation water which drains from the upslope lands.

A recent opinion, *Yue v. City of Auburn*, 3 Cal.App.4th 751, 4 Cal.Rptr.2d 653 (1992) calls into question the applicability of *Belair* to this dispute. *Yue* involved an allegation that construction of a housing subdivision increased the imperviousness of the soil, which in turn substantially increased storm water runoff onto plaintiff's property. The complaint alleged an inverse condemnation claim against the City for failing to require the subdivision developer to mitigate the storm water runoff and for failing to upgrade the City's drainage facilities to accommodate the increased flow of water.

The court in *Yue* recognized that there are three categories of water which serve as potential predicates for inverse condemnation liability for public entities; surface waters, flood waters and stream waters. *Id.* at 758, 4 Cal.Rptr.2d 653. The pleading requirements vary based on the type of water at issue. The court decided that the storm water runoff was properly categorized as surface waters and held that the requirement in *Belair* that a plaintiff plead facts which exclude "the probability that other forces alone produced the injury" was inapplicable as *Belair* involved flood waters. *Id.* at 761–62, 4 Cal.Rptr.2d 653.

The court reversed the trial court's sustaining of a demurrer:

> [P]laintiffs are not alleging defendant had a duty to build or upgrade a flood control system to prevent naturally occurring floodwaters from flowing onto plaintiffs' land. Instead, they are contending defendant approved the development of a subdivision, which increased the flow of surface waters, then built a culvert to divert these surface waters even though defendant knew, or should have known, the new culvert would empty into an existing drainage system with a significantly smaller capacity, inevitably causing defendants' land to be flooded. *In other words, plaintiffs are alleging defendant had a duty to prevent harm to plaintiffs' land caused by conditions defendant approved or created.*

*Id.* at 763, 4 Cal.Rptr.2d 653 (citations omitted, emphasis added).

Without deciding the issue, the irrigation water in question here also appears not to fall into the category of storm water. Plaintiffs allege that the district knew or should have known that the irrigation of upslope lands was causing harm to Plaintiffs' land and that the district "had a duty to prevent harm to plaintiffs' lands caused by conditions defendant approved or created."

It cannot be said at this stage of the litigation that Westlands has not substantially participated in the design, construction, and operation of the delivery system which is the alleged cause of Plaintiffs' injury. Westlands has entered into various contracts to assure continued supply of irrigation water. It has also allegedly funded the construction of expanded delivery systems in Area II.

Westlands also raises a type of impossibility defense, alleging that it cannot avoid injury to Plaintiffs' land as the state and federal governments have prevented it from providing drainage. Notwithstanding the obvious solution of terminating water deliveries to the upslope landowners, Westlands' contention involves factual issues unresolvable on a motion to dismiss.

Westlands also differentiates those plaintiffs formerly provided drainage service from those who were not. It claims that plaintiffs alleging only a prospective right to drainage service cannot state an inverse condemnation claim as they have no protectable property right. Nevertheless, all plaintiffs have a protectable property right to be free of the alleged injury caused by the influx of contaminated water.

■ In their opposition brief, Plaintiffs state that Paragraph 190 of the complaint alleges an additional inverse condemnation claim by those landowners who formerly received drainage. Paragraph 190 alleges:

> In 1985 and 1986 the District failed to challenge in any substantive way the SWRCB Orders, entered into the 1985 Agreement, and participated in closing the

As–Built San Luis Drain and plugging the As–Built Drainage Collector System.

Westlands contends that to the extent this allegation relates to an inverse condemnation claim, it is time barred.

■ The statute of limitations for a federal inverse condemnation claim is one year. *McMillan v. Goleta Water Dist.,* 792 F.2d 1453 (9th Cir.1986), *cert. denied,* 480 U.S. 906, 107 S.Ct. 1348, 94 L.Ed.2d 519 (1987). Under state law, "an inverse condemnation action that is based upon 'damage' to property must be filed within three years of discovery of the damage." *Patrick Media Group v. Cal. Coastal Comm'n,* 9 Cal.App.4th 592, 11 Cal.Rptr.2d 824 (1992) (citing Cal. Code of Civ. Proc. § 338(j)). The limitations period runs from the date when the alleged wrongful act is done and the liability arises. *Mosesian v. Fresno County,* 28 Cal.App.3d 493, 500, 104 Cal.Rptr. 655 (1972). The acts alleged in paragraph 190 occurred more than three years prior to Plaintiffs' filing on January 31, 1991.

At the hearing, Plaintiffs advanced three reasons why this claim is not time barred. They first cited *United States v. Dickinson,* 331 U.S. 745, 67 S.Ct. 1382, 91 L.Ed. 1789 (1947), for the proposition that, similar to a continuing tort, the limitations period for an inverse condemnation claim does not accrue so long as the injury continues to occur. Yet, paragraph 190 alleges that the injury occurred in 1985 and 1986. It does not appear to allege that any harm is ongoing.

■ Plaintiffs additionally claim that Westlands is equitably estopped from raising a limitations defense because they reasonably relied on the extensions granted by the water district in filing their suit.[15] Plaintiffs also contend that the limitations period should be equitably tolled due to their preoccupation with participation in the *Barcellos* settlement. Standard principles of estoppel and equitable tolling apply in the inverse condemnation context. *Patrick Media Group,* 11 Cal.Rptr.2d at 838. As the parties have not briefed these issues and it is not possible to find at this stage of the litigation, as a matter

---

**15.** Plaintiffs acknowledge that no administrative claim is required to file an inverse condemnation claim. *See Patrick Media Group,* 11 Cal.Rptr.2d at 833.

of law, that Plaintiffs cannot allege facts under which estoppel or equitable tolling prevents the application of the limitations period, Westlands' dismissal motion as to paragraph 190 must be denied.

## III.

## FEDERAL DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT AND JUDGMENT ON THE PLEADINGS

The claims asserted against the Federal Defendants are similar to those asserted against Westlands:

The first claim (¶¶ 119–125) seeks declaratory and injunctive relief with respect to seventeen controversies (¶ 121(a)–(q)) concerning duties allegedly owed to Plaintiffs by the Federal Defendants.

The fourth claim (¶¶ 138–147) seeks tort damages and injunctive relief for claims sounding in negligence, trespass, and nuisance.

The fifth claim (¶¶ 148–154) alleges that Federal Defendants have breached the 1963 Service Contract, the 1965 Repayment Contract, the "recordable contracts," and the 1986 Stipulated Judgment, and seeks money damages and appropriate equitable relief for such breaches.

The sixth claim (¶¶ 155–161) asserts that Federal Defendants have taken, and damaged, Plaintiffs' property for public use, but have failed to pay them just compensation. The property alleged to have been taken includes flowage or easements upon, and contract and statutory rights appurtenant to, Plaintiffs' lands.

Federal Defendants seek judgment on the pleadings as to all allegations made against them, except as to their immunity from tort damages defense under the discretionary function exception, for which they seek partial summary judgment.

### A. Claims for Injunctive and Declaratory Relief

 Paragraph 121(p) alleges that Federal Defendants violated the National Environmental Policy Act of 1969 (NEPA), 42 U.S.C. § 4332, by failing to prepare environmental impact statements for proposed actions. Plaintiffs refer to Paragraph 121(a) which alleges the existence of three documents in which Federal Defendants have stated "that they will *not* develop or implement a drainage plan specified in the 1986 Stipulated Judgment" (emphasis added). An agency's refusal to act is not "the type of conduct that requires an environmental impact statement." *State of Alaska v. Andrus*, 591 F.2d 537, 540 (9th Cir.1979).

Judgment on the pleadings must be granted as against Plaintiffs' claims regarding alleged NEPA violations.

### B. Tort Claims

Plaintiffs' complaint alleges three tort claims. Paragraph 140 alleges negligent performance of numerous alleged duties, while paragraph 141 alleges public and private nuisance and paragraph 142 alleges trespass.

1. Right to Recover Money Damages for Tortious Violation of Statutory and Contractual Duties

 Paragraph 140 alleges that the Federal Defendants and their employees and agents were negligent in:

(a) performing their duties under the 1986 Stipulated Judgment, including their duties to prepare a drainage plan and to construct new collector drainage facilities; (b) attempting to obtain discharge permits from the SWRCB; (c) operating and maintaining the CVP and the Unit so as to cause and fail to prevent the inundation of plaintiffs' lands with saline water, including distributing irrigation water to Area II and other lands upslope of Area I; (c) [sic, referred to as (cc) here] closing the As–Built Drainage Collector System and related actions, including rendering and implementing the Migratory Bird Treaty Act opinion, failing to challenge the SWRCB Orders, and making and performing the 1985 Agreement; (d) performing their duties under the 1963 Service Contract and the 1965 Repayment Contract; (e) transferring operation, care, and maintenance of CVP and Unit Facilities to DWR; (f) per-

forming their duties under statute, including the 1960 Act, the 1977 Act, and the Merger law; (g) failing to work, or delaying to work, on the As–Planned San Luis Drain and the As–Planned Drainage Collector System; (h) representing to plaintiffs and the public that such facilities would be completed timely; (i) building the middle portion of the As–Built San Luis Drain prior to the northern portion; and (j) building water distribution systems in Area II before completing the water distribution system and the As–Built Drainage Collector System in Area I.

To recover in tort, a plaintiff must establish the existence of a legal duty owed by another. B.E. Witkin, 5 *Summary of California Law* 61 (9th ed.1987). Federal Defendants argue that all of the acts alleged in paragraph 140 arise from duties, which, if they exist, were created either by statute or contract. Federal Defendants contend that a tort action cannot be maintained based solely on the existence of statutory or contractual duties.

Other than subparagraph (a), which describes duties created under the *Barcellos* Judgment,[16] neither the complaint nor Plaintiffs' brief suggests the existence of any source of the alleged duties other than the San Luis Act or various contracts between Westlands and the United States. Two of the allegations, subparagraphs (d) and (f), refer specifically to the Act and the contracts. The other alleged duties can only arise from contract or statute; there is no duty to undertake such acts as constructing a project in a specified sequence or time-frame,[17] operating a project in a particular manner,[18] or in rendering legal opinions, challenging state orders, and obtaining permits.[19] Subparagraph (c) is a misplaced nuisance and/or trespass claim otherwise alleged in paragraphs 141 and 142.

Federal Defendants cite *United Scottish Insurance Co. v. United States*, 614 F.2d 188 (9th Cir.1979), *aff'd after remand*, 692 F.2d 1209 (9th Cir.1982), *rev'd on other grounds*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), for the proposition that the United States cannot be liable in tort merely for breaching a duty imposed by federal statute.[20] The Federal Tort Claims Act dictates that the federal government "shall be liable ... in the same manner and to the same extent as a private individual under like circumstances." 28 U.S.C. § 2674. The court in *United Scottish Insurance* interpreted the restrictive language of § 2674 to mean, "courts may not determine governmental liability without considering the liability of a private person of 'like circumstances' pursuant to relevant state law." 614 F.2d at 198. "[T]he existence of a federal statutory duty does not of itself create a duty to be vindicated by the [FTCA]." *Id.* at 194 n. 4. "[P]laintiffs may not base their claims on alleged breaches of a duty arising solely out of federal law when there is no corresponding duty under state tort law ..." *Id.* at 192, (quoting *Blessing v. United States*, 447 F.Supp. 1160, 1186 n. 37 (E.D.Pa.1978)). *See also Baker v. United States*, 817 F.2d 560, 566 (9th Cir.1987) ("[T]he district court should consider which state's substantive law applies and whether that state provides a cause of action against private parties that is

---

16. Federal Defendants make no argument as to why judgment on the pleadings should be entered as to subparagraph (a).

17. *E.g.*, claims (g), (h), (i), and (j).

18. *E.g.*, claim (e).

19. *E.g.*, claims (b) and (cc).

20. Plaintiffs note that *United Scottish Insurance* was reversed by *United States v. Varig Airlines*, 467 U.S. 797, 104 S.Ct. 2755, 81 L.Ed.2d 660 (1984), and contend that the Federal Defendants' argument was further rejected by the Supreme Court in *Berkovitz v. United States*, 486 U.S. 531,

108 S.Ct. 1954, 100 L.Ed.2d 531 (1988). *Varig* and *Berkovitz* discuss only the applicability of the FTCA's discretionary immunity exception to regulatory functions mandated by federal law. The Supreme Court's reversal of *United Scottish Insurance* did not affect the portion of the Ninth Circuit's opinion which holds that the federal government cannot be held liable in tort for its failure to fulfill a statutory duty where no corresponding duty exists under state law. *See Baker v. United States*, 817 F.2d 560, 566 (9th Cir. 1987); *Art Metal–USA, Inc. v. United States*, 753 F.2d 1151, 1157 n. 11 (D.C.Cir.1985) ("Judge Wallace's cogent and well-reasoned analysis for the Ninth Circuit of the relationship between violations of duties set forth in federal law is not affected by the Supreme Court's reversal").

analogous to the claims against the United States ..."); *Art Metal–USA, Inc. v. United States*, 753 F.2d 1151, 1156–60 (D.C.Cir.1985) (extensive analysis of claim of negligent performance of a statutory duty).

To the extent that Plaintiffs allege that Federal Defendants are liable in tort for failing to fulfill an alleged duty contained in the San Luis Act to provide drainage, they cannot point to any corresponding duty under California state law to provide drainage. Since no citizen could be sued in tort for failing to construct drainage facilities, neither can the United States, if the claim is based solely on its alleged statutory duty. This is not to say that Plaintiffs cannot maintain a tort claim for the damage caused by Federal Defendants continuing to provide water delivery in the absence of drainage, but these claims sound in nuisance and trespass, not negligence.

■ Federal Defendants also allege that Plaintiffs cannot maintain a tort-based claim by relying on an alleged breach of a contractual duty to provide drainage. While they acknowledge that "negligent breach of contract" is an actionable tort under California law,[21] they cite to *Woodbury v. United States*, 313 F.2d 291, 296 (9th Cir.1963), for the proposition that such a claim cannot be asserted to overcome the jurisdictional limitation of the Tucker Act, 28 U.S.C. § 1346(a)(2). That is, where Congress allows tort claims against the United States to be brought in district court, yet requires breach of contract claims which seek recovery of more than $10,000 to be brought in the Claims Court, it would defeat the intent of Congress to allow a Plaintiff to sue the United States in tort on its breach of contract.

In *Woodbury*, a contractor sued the United States for breach of fiduciary duty under the FTCA for the alleged acts of the Housing and Home Finance Agency in giving preference to its own interests as a creditor in a foreclosure action. *Id.* at 294. After extensive discussion of the existing case law and the facts of the dispute, the court determined that the contractor's claim could be characterized as a tort "only incidentally and conceptually," holding:

> We do not mean that no action will ever lie against the United States under the Tort Claims Act if a suit could be maintained for a breach of contract based upon the same facts. We only hold that where, as in this case, the action is essentially for breach of a contractual undertaking, and the liability, if any, depends wholly upon the government's alleged promise, the action must be under the Tucker Act, and cannot be under the Federal Tort Claims Act.

*Id.* at 295–96.

Here, as outlined below, jurisdiction for the breach of contract claim exists concurrently in district court, pursuant to 43 U.S.C. § 390uu, and the Claims Court. Yet this does not change the conclusion that a tort action which "depends wholly upon the government's alleged promise ... cannot be under the Federal Tort Claims Act." *Id.* at 296.

Neither party cites authority exactly on point: whether a negligent breach of contract claim is cognizable under the FTCA. Plaintiffs agree that their allegations of negligence based on the existence of contractual obligations are properly termed as a claim for negligent breach of contract, yet cite to a string of cases distinguishing *Woodbury* on factual grounds. These cases are summarized in *Love v. United States*, 915 F.2d 1242 (9th Cir.1989) and *Fort Vancouver Plywood Co. v. United States*, 747 F.2d 547 (9th Cir. 1984). In each of these cases, the Ninth Circuit found that the contract was only incidental to the plaintiff's tort claim. The contract established an element of the tort, yet the alleged tortious conduct was independent of the obligations created under the contract. *See, e.g., Love*, 915 F.2d at 1247 (conversion claim based on government employees' actions in seizing and selling property secured by federal loans cognizable under FTCA where contract "establishes only an underlying element of the tort"); *Fort Vancouver*,

---

21. *See, e.g., Eads v. Marks*, 39 Cal.2d 807, 810, 249 P.2d 257 (1952). The tort is alternately termed, "negligent performance of contract."

747 F.2d at 552 (tort action based on government's negligence in burning timber, which plaintiff had contracted to purchase, cognizable under FTCA where "the contract establishes ownership interests, but otherwise is not implicated").

By its nature, an allegation of negligent breach of contract is based wholly on the existence of promises created by contract and the parties' compliance with those promises. While the legal analysis differs from that employed in a claim for breach of contract, the factual analysis is identical. The contract is not merely incidental to consideration of whether the tort occurred; it is central.

An examination of paragraph 140 bears out this determination; it does not assert the existence of any duty created under state law. Apart from subparagraph (a) and those assertions which may be interpreted as alleging a failure to fulfill a federal statutory duty, all acts alleged in paragraph 140 arise from contractual duties. These claims are "essentially for breach of a contractual undertaking, and the liability, if any, depends wholly upon the government's alleged promise." *Woodbury*, 313 F.2d at 296. They are not cognizable under the FTCA.

The motion for judgment on the pleadings is granted as to all allegations of paragraph 140, except subparagraph (a).

## 2. Discretionary Function Immunity

 Federal Defendants contend that summary judgment should be entered against Plaintiffs' remaining tort claims as the tortious acts alleged fall within the discretionary function exception. While the FTCA provides a waiver of sovereign immunity as to tort claims, under 28 U.S.C. § 2680(a), the United States retains immunity for torts committed in the exercise of a discretionary function. The discretionary function exception reestablishes immunity for

> any claim ... based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a federal agency or an

employee of the Government, whether or not the discretion involved be abused.

28 U.S.C. § 2680(a). This exception "marks the boundary between Congress' willingness to impose tort liability upon the United States and its desire to protect certain governmental activities from exposure to suit by private individuals." *Berkovitz v. United States*, 486 U.S. at 536, 108 S.Ct. at 1958 (quoting *United States v. Varig Airlines*, 467 U.S. 797, 808, 104 S.Ct. 2755, 2762, 81 L.Ed.2d 660 (1984)).

 In ruling on the applicability of the exception, a court must engage in a "particularized and fact-specific inquiry" in which the government bears the burden of proving its entitlement to immunity. *Prescott v. United States*, 973 F.2d 696, 700, 702 (9th Cir.1992). Two criteria must be satisfied. First, the acts or omissions must be "discretionary in nature, acts that 'involve an element of judgment or choice.'" *United States v. Gaubert*, —— U.S. ——, ——, 111 S.Ct. 1267, 1273, 113 L.Ed.2d 335 (1991) (citations omitted). "[T]he discretionary function exception will not apply when a federal statute, regulation, or policy specifically prescribes a course of action for an employee to follow" and the employee fails to follow that course of action. *Id.*

"If the challenged conduct does involve an element of judgment, the second step is to determine whether that judgment 'is of a kind that the discretionary function was designed to shield." *Berkovitz*, 486 U.S. at 536, 108 S.Ct. at 1959. Under the second prong, "the United States must prove that each and every one of the alleged acts of negligence (1) involved an element of judgment and (2) the judgment was grounded in social, economic, or political policy." *Prescott*, 973 F.2d at 703.

Federal Defendants seek summary judgment as to all of Plaintiffs' tort claims, yet provide no evidence that the acts alleged in paragraphs 140(a), 141, and 142 involve an element of judgment, which was grounded in social, economic, or political policy.[22] Feder-

---

22. Instead, Federal Defendants provide evidence as to acts alleged in paragraph 140(b)–(j). It is

not necessary to consider this evidence as these claims must be dismissed.

al Defendants' motion is denied without prejudice.

### 3. Flood Immunity Doctrine

 Federal Defendants alternately allege that Plaintiffs' claims seeking tort damages are barred by the immunity provision of the Flood Control Act of 1928, 33 U.S.C. § 702c. Section 702c provides: "No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place."

The parties agree that resolution of this issue depends upon interpretation of three opinions: the Supreme Court case which outlines basic liability under § 702c, *United States v. James*, 478 U.S. 597, 106 S.Ct. 3116, 92 L.Ed.2d 483 (1986); the only Ninth Circuit case interpreting *James, McCarthy v. United States*, 850 F.2d 558 (9th Cir.1988); and the November 5, 1991 memorandum decision of the Honorable Edward D. Price, in *Firebaugh Canal Company v. United States*, CV–F–88–634 OWW, which was later partially consolidated with this case. Judge Price found that the United States was not entitled to immunity under section 702c. Federal Defendants concede that Judge Price ruled on identical facts as presented here, yet invite the Court to revisit the issue and find that immunity exists. *See Castner v. First National Bank of Anchorage*, 278 F.2d 376, 380 (9th Cir.1960) ("The second judge must conscientiously carry out his judicial function in a case over which he is presiding. He is not doing this if he permits what he believes to be a prior erroneous ruling to control the case."); *Solano Garbage Co. v. Cheney*, 779 F.Supp. 477, 483 (E.D.Cal.1991) ("[T]he law of the case doctrine does not prevent the court from revising a ruling before final judgment.")

The proper starting point is a review of Judge Price's ruling:

The first argument of the United States is that 33 U.S.C. § 702c provides in pertinent part that:

No liability of any kind shall attach to or rest upon the United States for any damage from or by floods or flood waters at any place.

This section was given a very broad reading by the United States Supreme Court in *United States v. James*, 478 U.S. 597, 92 L.Ed.2d 483, 106 S.Ct. 3116 (1986). Unfortunately, the facts of the case render it subject to endless discussion as to what the Court really meant. For instance, the district courts, in the cases before the Supreme Court, found that in each instance, the employees of the United States were engaged in flood control. However, the Supreme Court did not rest its decision on that basis. The Supreme Court did discuss *Morici Corp. v. United States*, 681 F.2d 645 (9th Cir.1982) and *Hayes v. United States*, 585 F.2d 701 (4th Cir.1978), decided before the *James* case, which conditioned the grant of immunity upon the question of whether the government's activity, which caused the plaintiffs' damage, was related to flood control. However, the Court did not expressly adopt this approach. The Court did state in *United States v. James, supra,* 478 U.S. at 608 [106 S.Ct. at 3122], 92 L.Ed.2d at 495 that: "Congress clearly sought to ensure beyond doubt that sovereign immunity would protect the government from 'any' liability associated with flood control."

In *McCarthy v. U.S.*, 850 F.2d 558 (9th Cir.1988), plaintiff was injured when driving [sic] into a lake owned and operated by the United States. At 561–62, the court stated:

Given the difficulty of distinguishing between the active and passive operations of federal flood control facilities, particularly since a passive condition is invariably the result of other active forces which have gone before, we decline to adopt the distinction urged by *McCarthy*. By including Lewisville Lake as part of a larger federal flood control facility, the United States created a "condition" which under a variety of circumstances could result in harm to person and property. As the Supreme Court underscored in *James*, the "sweeping language" and legislative history of § 702c indicate a Congressional intent "to ensure beyond doubt that sovereign immunity would protect the government from 'any' liability associated with flood control." *James* [478 U.S. at 608], 106 S.Ct. at 3122. Accordingly, because waters contained in a

federal flood control project for purposes related to flood control were a substantial factor in bringing about *McCarthys'* injuries, the immunity provision applies.

Nor is this conclusion altered by the multi-purpose nature of the flood control facility at Lewisville Lake. It is clear the immunity provision of § 702c can apply even though a federal project has multiple purposes and is not intended exclusively for flood control. *Morici,* 681 F.2d at 647; *Aetna [Ins. Co. v. United States],* 628 F.2d [1201] at 1203 [ (9th Cir.1980) ]. *James* itself involved injury to recreational users of a reservoir that also had federal flood control use. Further, we have declined previously to adopt the position apparently now urged by *McCarthy,* namely, the notion that the applicability of the immunity provision in cases involving multi-purpose projects depends upon the particular use to which the project was being put when the negligence occurred. *See Morici,* 681 F.2d at 647. In *Morici* we expressly rejected this argument, which relies on the Fourth Circuit case *Hayes v. United States,* 585 F.2d 701 (4th Cir.1978), and reaffirmed the "wholly unrelated" standard for determining whether § 702c immunity applies.

In *Fryman v. U.S.,* 901 F.2d 79 (7th Cir. 1990), Judge Easterbrook reviewed all of the circuit court cases decided up to the date of that decision, i.e., April 26, 1990. In *Fryman,* the plaintiff, like the plaintiff in *McCarthy, supra,* had struck his head while diving into a lake which was part of the flood control project on the Mississippi River. The district court had dismissed the complaint for lack of jurisdiction. At pages 81–82, Judge Easterbrook made the following observation:

If 702c has limits, they have to do with causation. In *Boyd [v. United States,* 881 F.2d 895 (10th Cir.1989) ] the court could have asked, not whether boating and snorkeling are "recreational," but whether the injury stemmed from features that differentiate flood-control lakes from purely recreational lakes. Boaters in *James* drowned because the imperatives of flood control led to the release of water from the lake. Collisions between swimmers and powerboats, by contrast, occur on natural lakes and purely recreational artificial lakes; none of the flood-control activities increased the probability of such a run-in.

Perhaps, however, an accident is "wholly unrelated" to flood control only when the existence of the project does not increase its probability. In that case, simple drownings are encompassed by § 702c because, but for the project, there would be no water, and but for water no one would swim and drown. Two courts of appeals have reached this conclusion. *McCarthy v. United States,* 850 F.2d 558, 562 (9th Cir. 1988) (diving accidents) (unless the injury is "wholly unrelated" to the flood-control project, § 702c applies); *Mocklin v. Orleans Levee District,* 877 F.2d 427, 430 & n. 6 (5th Cir.1989) (drowning; same rationale). Two others, although sympathetic to this approach, rely in addition on the fact that particular injuries were made more likely by the use of the lake in flood control. *DeWitt Bank & Trust co. v. United States,* 878 F.2d 246 (8th Cir.1989) (diving accident); *Dawson v. United States,* 894 F.2d 70 (3rd Cir.1990) (drowning). *James* did not adopt the "wholly unrelated" language from *Morici;* it only quoted it in a footnote. Courts assuming that these words are "the test" may be jumping the gun, and at all events wholly unrelated to what—the project, or the risk that led to the particular accident?—is an unsettled question.

Flood-control activities increase the probability of injuries such as Fryman's. Lake Shelbyville rises as flood waters enter in the spring and falls as water is released in the summer and fall to maintain constant rates of flow through the rivers downstream. During the spring and part of the summer, the island from which Dennis Fryman leapt is under water. After it emerges (in 1983, two weeks before the accident) its shoreline changes with the lake level. This makes it hard to identify places hazardous to divers; which spots are safe and which dangerous depends on the level of the lake. Constantly changing shorelines also are hard to plaster with signs. Unless the Corps of Engineers were to move the signs frequently, it would have to establish ranks of signs at

different depths, which would appear as the lake fell. Signs themselves might be dangerous. The signs at higher elevations might need to warn divers of other signs still beneath the waves. ("DANGER! Concealed Warning Signs!") Only preventing all visits to the island would solve the problem. Yet because "the problem" is attributable in substantial part to the nature of a flood-control project, a claim based on the theory that the Corps of Engineers should have closed the island to swimming in order to protect recreational users is the same in principle as the claim that the Corps should have closed to boaters the lakes in *James*.

In the case before the Court, we are dealing with water being released to certain irrigation districts located on the west side of the San Joaquin Valley in California. The water has its origins in rivers that have been controlled by dams on various northern and central California rivers which were built as part of the Central Valley Project, a flood control project of the Federal Government. However, the water which is impounded is then routed to various users, including the Westside Irrigation District [sic]. Upon receipt of the water, the water is transported through canals controlled by the Westside Irrigation District, the intervenor in this case (hereafter "Westside"). Westside then distributes the water to its customers who apply it to their lands. Plaintiff alleges that this water seeps into the subsoil, flows downhill, and then damages the land which lies within the boundaries of the plaintiff's land. Unless the water once being a part of the larger mass of flood control water, receives a separate status when in this stage, which follows it throughout its journey, the Court can find no causal relation between the government's flood control activities and the plaintiff's claimed damages.

Using Judge Easterbrook's causation approach, this Court cannot find that the control and impounding of flood waters by the government is not the cause in fact, or the legal cause, of plaintiff's claimed damage.

The government cites *Baker v. The Westside Water District*, an unpublished decision out of the Sacramento branch of this court

district. That case holds that the Central Valley Project is a flood control district. This Court has no disagreement with that decision; however, that does not completely answer the issue raised by plaintiffs' pleadings.

The Court finds that the government is not entitled to immunity based upon 33 U.S.C. § 702c.

Memorandum Decision Re: Plaintiff's Motion for Reconsideration, No. CV–F–88–634–EDP [OWW], (E.D.Cal. Nov. 5, 1991).

Federal Defendants concede that there is no direct causal nexus between the operation of the CVP for flood control purposes and the subsurface inundation complained of by Plaintiffs. They are correct that the holding of the Ninth Circuit in *McCarthy* does not require such a relationship, however. The appropriate question is not whether a sufficient causal nexus exists between the alleged injury and the operation of the CVP for flood control purposes, but rather a sufficient nexus exists between the alleged injury and the CVP *regardless* of whether it was being used at the time of injury for flood control, irrigation water delivery, or any other purpose.

*McCarthy* is clear on this point:

In *Morici* we approved that portion of the discussion in *Hayes* which stated "[t]here is no immunity for flooding caused by a federal project unrelated to flood control." We declined, however, to adopt the rule in *Hayes* that "[i]f the plaintiff could prove damage to his farm as a result of the dam's operation as a recreational facility without relation to the operation of the dam as a flood control project, he would avoid the absolute bar of § 702c." *Instead we stated that it is the purpose of the project authorized by Congress and not the purpose of the employee's conduct that is determinative.*

Thus, in this circuit, the immunity provision of § 702c does not apply when the damage or injury is "wholly unrelated to any Act of Congress authorizing expenditures of federal funds for flood control, or any act undertaken pursuant to any such authorization. *So long as a project is authorized by Congress for flood control pur-*

*poses, and the damage or injury is related to the use of that project, immunity continues to attach ...* Under *Morici,* "[e]ven if the project was being operated at the time of the negligence for a purpose other than flood control," so long as the damage or injury was not "wholly unrelated" to a Congressionally authorized flood control project, a sufficient nexus for purposes of § 702c immunity exists.

850 F.2d at 562–63 (citations omitted, emphasis added).

Judge Easterbrook's discussion of *McCarthy* in *Fryman* only bolsters this interpretation. His parenthetical summarizes the holding of *McCarthy* as "unless the injury is wholly unrelated to the flood-control *project,* § 702 applies." 901 F.2d at 82 (emphasis in original). He further explains that under *McCarthy,*

an accident is "wholly unrelated" to flood control only when the existence of the project does not increase its probability. In that case, simple drownings are encompassed by § 702c because, but for the project, there would be no water, and but for water no one would swim and drown.

*Id.* Applying this logic, but for the CVP, there would be no irrigation water, and but for the water delivery, Plaintiffs' lands would not be inundated by contaminated water.

Judge Easterbrook disagrees with *McCarthy:*

*James* did not adopt the 'wholly unrelated' language from *Morici;* it only quoted it in a footnote. Courts assuming that these words are 'the test' may be jumping the gun, and at all events wholly unrelated *to what*—the project, or the risk that led to the particular accident?—is an unsettled question.

*Id.* (emphasis in original). Yet the Ninth Circuit has determined that the "wholly unrelated" test does apply and it relates not to the nature of the risk that led to the accident but to the nature of the project itself. *See McCarthy,* 850 F.2d at 562.

A sufficient causal nexus exists on these facts. Plaintiffs allege that they have suffered injury because the United States has delivered irrigation water without providing drainage. If no water was delivered, drainage would be unnecessary and no injury would exist. Judicial notice can be taken of the fact that the Federal Defendants are delivering water to Westlands via the CVP and that one of the purposes of the CVP is flood control. *See Sanborn v. United States,* 453 F.Supp. 651, 658 (E.D.Cal.1977) ("Certainly, the court can take judicial notice that the Sacramento River is included within the Central Valley Project and that the Central Valley Project has, as one of its many purposes, flood control.") (citing *United States v. Gerlach Live Stock Co.,* 339 U.S. 725, 731, 70 S.Ct. 955, 958, 94 L.Ed. 1231 (1950)). Plaintiffs' injury is not "wholly unrelated" to a Congressionally authorized flood control project and a sufficient nexus for purposes of § 702c immunity exists. *McCarthy,* 850 F.2d at 563.

In succeeding in this argument, Federal Defendants only meet the third prong of the three-prong test established under *James* and *McCarthy.* The second prong involves a showing that the injury allegedly sustained falls within the term "damage" in § 702c. *See McCarthy,* 850 F.2d at 561 n. 1. This is easily met, as *"James* expressly found that the word 'damage' included both injury to property and injury to the person." *Id.*

The first prong requires a determination that the water at issue can be termed "floodwater" as used in § 702c. *See McCarthy,* 850 F.2d at 561. The Supreme Court held in *James* that "It is thus clear from § 702c's plain language that the terms 'flood' and 'floodwater' apply to all waters contained in or carried through a federal flood control project for purposes of or related to flood control, as well as to waters that such projects cannot control." 478 U.S. at 605, 106 S.Ct. at 3121.[23]

---

**23.** Any attempts by Plaintiffs to distinguish away *James* and *McCarthy* based on the fact that the cases involve water contained by flooding control projects in the form of dammed reservoirs, while the present case involves injury suffered once the

water left the flooding control project, must fail. *James* clearly defines floodwater as all water either "contained or *carried through* a flood control project." Nor is it significant that there is a temporal and spatial gap between the release of

The definition of "floodwater" in *James* requires a two-part analysis: 1) is the water contained or carried through a federal flood control project; and 2) is it contained or carried through the project for "purposes of or related to flood control"? In *McCarthy,* the Ninth Circuit found:

> [I]nsofar as the waters of Lewisville Lake are clearly "contained in" a federal flood control project and *further, where the water level of the Lake is monitored on a daily basis and discharged when necessary,* the waters herein satisfy the *James* definition of "floodwater," and accordingly, fall within the meaning of the statute.

850 F.2d at 561 (emphasis added). As outlined above, the CVP can be considered a flood control project. Yet Federal Defendants have presented no evidence that the irrigation water supplied to Westlands was carried through the CVP for "purposes of or related to flood control." The presence of water or its conveyance through the CVP alone is not enough. If the sole purpose of the water's conveyance is irrigation, the water is not "floodwater" and the immunity would not apply.

Absent such evidence, Plaintiffs' tort claims cannot be dismissed at this stage of the litigation on the basis of flood immunity.

### C. Breach of Contract Claims

#### 1. Jurisdiction to Hear Contract Claims for Monetary Damages

 Federal Defendants dispute jurisdiction exists to hear Plaintiffs' breach of contract claims. They seek dismissal or transfer of the claims to the Claims Court, pursuant to 28 U.S.C. § 1631. The complaint asserts jurisdiction alternately under 43 U.S.C.

§ 390uu, 43 U.S.C. § 666, and 28 U.S.C. § 1367(a).

43 U.S.C. § 390uu provides:

Consent is given to join the United States as a necessary party defendant in any suit to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States regarding any contract executed pursuant to Federal reclamation law. The United States, when a party to any suit, shall be deemed to have waived any right to plead that it is not amenable thereto by reason of its sovereignty, and shall be subject to judgments, orders, and decrees of the court having jurisdiction, and may obtain review thereof, in the same manner and to the same extent as a private individual under like circumstances. Any suit pursuant to this section may be brought in any United States district court in the State in which the land involved is situated.

As "[c]onsent is given to *join* the United States as a *necessary party defendant,*" Federal Defendants read the subsection to provide jurisdiction only when the United States is "joined with other defendants and where its presence is necessary to fully establish the rights of other parties over contracts executed pursuant to reclamation law."

Under this interpretation, the United States could only be sued in district court where there is at least one other defendant. It could never be sued alone on its contractual obligations. Federal Defendants cite no case law for the suggestion that the verb "to join" must be interpreted in a "strict legal sense" (as it is used in Fed.R.Civ.P. 19, for instance), rather than by its ordinary meaning. Such an interpretation is belied by the language of the second sentence of subsection uu, "[t]he United States, *when a party to any suit,* shall be deemed to have waived any right to plead that it is not amenable thereto by reason of its sovereignty ..."[24]

the water from the CVP by the Federal Defendants and the accrual of adverse effects upon Plaintiffs' lands. (That is, as described in Judge Price's opinion, the water is delivered to the water district, which then delivers it to farms lying upslope of Plaintiffs. The water then seeps into the subsoil, flows downhill, and damages Plaintiffs' land.) The injury alleged to be caused by Federal Defendants is their delivery of water to the water district. It is not alleged that Feder-

al Defendants are directly inundating Plaintiffs' land with water.

24. Such an interpretation is also implicitly contradicted by the only published case which makes mention of section 390uu, *Bostwick Irrigation District v. United States,* 900 F.2d 1285 (8th Cir.1990), in which the Eighth Circuit affirmed on the merits a district court's denial of the request of two irrigation districts for a declarato-

Federal Defendants' contention is also contradicted by the legislative history of the section. The Conference Committee Report, in summarizing the section, states:

The House amendment gives the consent of the United States to be sued to determine the rights of any entity which is a party to a reclamation contract with the United States. The provision is a waiver of the sovereign immunity of the United States.

*Buffalo Bill Dam, Reclamation Reform, and Papago Indian Water Rights, Conference Report,* H.R.Conf.Rep. No. 855, 97th Cong., 2d Sess., at 33 (1982). The legislative history indicates a broad waiver of immunity was intended. No conditions are placed on the ability of a party to a reclamation contract to sue the government.

Nor is it clear how Federal Defendants' interpretation of section 390uu affects this case. The United States has been joined with Westlands to determine the contractual rights of Plaintiffs. It is also unclear how the presence of the United States could be determined not to be "necessary to fully establish the rights of the other parties" where it is being sued by a third-party beneficiary for breach of a contract executed pursuant to reclamation law.

Federal Defendants contend that even if section 390uu provides jurisdiction for a district court to hear a contract claim generally, the Tucker Act dictates that suits based on breach of contract which seek money damages in excess of $10,000 must be brought in the Claims Court. They argue that allowing the suit to go forward in district court would contradict Congress' mandate as expressed in the Tucker Act. However, the Supreme Court has stated:

It is often assumed that the Claims Court has exclusive jurisdiction of Tucker Act claims for more than $10,000. (Title 28

U.S.C. § 1346(a)(2) expressly authorizes concurrent jurisdiction in the district courts and the Claims Court for claims under 10,000.) That assumption is not based on any language in the Tucker Act granting such exclusive jurisdiction to the Claims Court. *Rather, that court's jurisdiction is "exclusive" only to the extent that Congress has not granted any other court authority to hear the claims that may be decided by the Claims Court.*

*Bowen v. Massachusetts,* 487 U.S. 879, 910 n. 48, 108 S.Ct. 2722, 2740 n. 48, 101 L.Ed.2d 749 (1988).

Section 390uu authorizes a district court to hear a contract claim arising under reclamation law. Its language is broad enough to provide for the award of money damages. District courts are given authority "to adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States." Additionally, "The United States, when a party to any suit, . . . shall be subject to judgments, orders and decrees of the court having jurisdiction . . . in the same manner as a private individual under like circumstances." Money damages which result from another party's breach are contractual rights which a district court may adjudicate. Under section 390uu, an order to pay such damages binds the United States as it would any private individual.

Again, the legislative history of the section does not support Federal Defendants' contention.[25] The Conference Report describes the differences between the sovereign immunity waiver sections in the House and Senate bills:

House: The House amendment gives the consent of the United States to be sued to determine the rights of any entity which is a party to a reclamation contract with the United States. The provision is a waiver

---

ry judgment regarding their water contracts with the Bureau of Reclamation. The action was brought under section 390uu even though the United States was the sole defendant. *Id.* at 1287.

**25.** The Court has examined the extensive history of the Reclamation Reform Act of 1982. No mention of the term "money damages" was

found in the 1982 proceedings, other than in a handful of letters written by state agencies and water districts expressing their views on the proposed legislation. These letters presumed that the waiver provision made money damages available in the district courts. The fact such letters were made part of the legislative record is not indicative, by itself, of Congressional intent.

of the sovereign immunity of the United States.

Senate: The Senate amendment provides an identical waiver of sovereign immunity. In addition, the Senate provision states that a court, if it determines it appropriate based on the evidence, including written representations concerning the application of the federal reclamation law, may reform the contract.

The conferees agreed on the House language. In taking this action, *the conferees wish to make it clear that the actions of the conference committee should not be taken as prejudicial to any particular* form of evidence or *remedy under existing law,* but rather the applicable rules of evidence and *the applicable remedies should be employed by any court entertaining a suit brought to determine the rights of any party to a reclamation contract with the United States.*

*Buffalo Bill Dam, Reclamation Reform, and Papago Indian Water Rights, Conference Report,* H.R.Conf.Rep. No. 855, 97th Cong., 2d Sess., at 33 (1982). The statute provides that the federal government is subject to judgments "in the same manner and to the same extent as a private individual under like circumstances." Money damages is an applicable "remedy under existing law" in a breach of contract suit brought against a private individual.

Even if the language of the Conference Report is interpreted narrowly[26] to allow only declaratory relief actions,[27] the award of money damages is an "applicable remedy" in a declaratory relief action brought against a private individual. *See* 28 U.S.C. § 2202;[28] 10A C. Wright, A. Miller & M. Kane, *Federal Practice & Procedure,* Civil § 2771, at 765 (1983); *Horn & Hardart Co. v. National Rail Passenger Corp.,* 843 F.2d 546, 548–549 (D.C.Cir.), *cert. denied,* 488 U.S. 849, 109 S.Ct. 129, 102 L.Ed.2d 102 (1988).

If Congress intended to reserve to the Claims Court the exclusive remedy of money damages, it would have clearly set that reservation forth, either in section 390uu or its legislative history. Instead, the statute is written broadly and the Conference Report states that a district court is to award all applicable remedies in suits based on federal reclamation contracts. Contrary to the argument made by the Federal Defendants, section 390uu and the Tucker Act are not in conflict. They simply provide for concurrent jurisdiction in district court and the Claims Court where the subject matter of the contract arises under reclamation law.

Jurisdiction does not exist under either of the two alternate statutes identified by Plaintiffs; 43 U.S.C. § 666 and 28 U.S.C. § 1367. Section 666, known as the McCarran Amendment, provides in pertinent part:

> Consent is hereby given to join the United States as a defendant in any suit (1) for the adjudication of rights to the use of water of a river system or other source, or (2) for the administration of such rights, where it appears that the United States is the owner of or in the process of acquiring water rights by appropriation under State law, by purchase, by exchange, or otherwise, and the United States is a necessary party to any such suit.

Plaintiffs do not seek "adjudication of rights *to the use of water.*" Rather, they seek to compel Federal Defendants to provide drainage. No case law is cited which applies the waiver created by the McCarran Amendment more broadly than its plain language provides. Reliance on *Barcellos & Wolfsen, Inc. v. Westlands Water District,* 491 F.Supp. 263 (E.D.Cal.1980), is misplaced. *Barcellos* entails a request to "adjudicate the rights of all the parties and the United States government as they relate to the water which the government has acquired for the operation of the San Luis Unit of the Central Valley

---

**26.** *I.e.,* by focusing on the phrase that a suit may be brought to "determine the rights of any party to a reclamation contract."

**27.** This is a more narrow reading than is required under the statute itself, which provides jurisdiction not only to "decree" contractual rights but also to "adjudicate" such rights.

**28.** "Further necessary or proper relief based on a declaratory judgment or decree may be granted, after reasonable notice and hearing, against any adverse party whose rights have been determined by such judgment."

Project." *Id.* at 267. The priority of water rights of the private parties and the government's obligation to deliver water were the dominant issues presented in that case. *See Id.* at 264–265.

No jurisdiction exists under 28 U.S.C. § 1367, the supplemental jurisdiction statute which became effective in December of 1990. Section 1367 allows the district courts to hear related state claims, otherwise properly asserted in *state* court, *not* the *Claims Court.* No authority is cited for the proposition that Congress intended § 1367 to supplant the jurisdiction of the Claims Court for money damage claims against the United States.

### 2. Jurisdiction to Consider Equitable Relief Based on Contractual Obligations

■■■ The first claim seeks declaratory and injunctive relief based in part on the existence of alleged contractual obligations. Federal Defendants contend that judgment on the pleadings must be granted against those portions of Plaintiffs' claims for injunctive relief based on contractual rights because the United States has not waived its sovereign immunity to allow suits to compel specific performance of its contractual obligations; *i.e.,* no obligation created by contract may require the federal government to build drainage facilities.

43 U.S.C. § 390uu provides authority for a district court to "adjudicate, confirm, validate, or decree the contractual rights of a contracting entity and the United States," when the contract concerns reclamation law. The language of section 390uu subsumes the remedy of specific performance. The motion is denied on this basis.

### 3. Viability of the Contract Claims

■■■ Federal Defendants contend that even if jurisdiction exists to hear Plaintiffs' breach of contract claims, a viable claim is not alleged because it is impossible that Federal Defendants breached any of the contracts in question—the 1963 Service Contract, the 1965 Repayment Contract, the "recordable contracts," and the 1986 Stipulated Judgment—as none of the contracts impose a duty to provide drainage. Any mention of an obligation to provide drainage in the contracts is said to result not from a bargained-for-exchange between the parties to the contracts, but from a duty imposed by statute.

Federal Defendants contend that the 1963 Service Contract imposes no additional duties on the United States regarding drainage beyond any obligation which exists in the San Luis Act. The 1965 Repayment Contract simply allows Plaintiffs to purchase drainage service once the Drain becomes available. It does not impose a duty to actually construct drainage; the existence of drainage is merely a condition precedent to the fulfillment of the contract.

Federal Defendants have also denied that any statutory duty exists to provide drainage. If they are correct that no statutory exists, and the contracts speak of the United States providing drainage, it is unclear how the source of that duty can be anything other than contractual.

However, Federal Defendants advance an alternate theory: a statutory duty was created, but subsequent events (such as the events surrounding the closing of Kesterson Reservoir and the restrictions placed on appropriations riders each year) have either excused or extinguished performance of that duty.

It is impossible to resolve these contentions at this stage of litigation. No party has provided sufficient evidence to allow adjudication of an "impossibility defense" as to the fulfillment of duties created by section 1(a) of the San Luis Act. Neither have Plaintiffs or Federal Defendants identified specific language from the 1963 and 1965 contracts which they contend creates or fails to create a *contractual* drainage obligation owed by the United States. Federal Defendants make only broad, conclusory allegations as to the "recordable contracts" and the 1986 Stipulated Judgment.

■■■ In their initial brief, Federal Defendants claimed that the "Sovereign Acts Doctrine" served as an independent defense to Plaintiffs' contract claims. The Sovereign Acts Doctrine allows the United States to abrogate certain contractual obligations unless the terms of the contract "surrender"

the government's right to exercise its sovereignty as to the matter in "unmistakable terms." *See Bowen v. Public Agencies Opposed to Social Security,* 477 U.S. 41, 106 S.Ct. 2390, 91 L.Ed.2d 35 (1986). In their reply brief, Federal Defendants concede that Plaintiffs' contract claims cannot be dismissed under the Sovereign Acts Doctrine at this stage of litigation due to factual disputes "as to whether any contractual right to drainage services is 'a benefit gratuitously conferred by statute' and thus revokable, or reflects a 'bargained-for contract right[s], supported by independent consideration.' "[29] Such factual disputes make it impossible to dismiss Plaintiffs' contract claims on the more general basis that the contracts create no contractual rights regarding drainage, but only refer to preexisting statutory obligations. The motion must be denied on this ground.

## D. *Inverse Condemnation Claims*

■ Plaintiffs seek just compensation for the Federal Defendants' alleged actions in permanently or temporarily taking their property by causing it to be inundated with drainage water.

This Court lacks jurisdiction to consider a takings claim. As explained in *McKeel v. Islamic Republic of Iran,* 722 F.2d 582, 590 (9th Cir.1983), *cert. denied,* 469 U.S. 880, 105 S.Ct. 243, 83 L.Ed.2d 182 (1984):

> There is district court jurisdiction for civil actions against the United States, such as a taking claim, only if the damages sought do not exceed $10,000. 28 U.S.C. § 1346(a)(2). Because appellants contend that each claim against [appellee] amounts to at least $5,000,000 . . . jurisdiction would lie not with the district court, but with the United States Claims Court, 28 U.S.C. § 1491.

*See also Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1020, 104 S.Ct. 2862, 2882, 81 L.Ed.2d 815 (1984) ("Once a taking has occurred, the proper forum for [plaintiff's] claim is the Claims Court").

The complaint asserts jurisdiction under the same statutes as relied on in the breach of contract claim: 43 U.S.C. § 390uu, 43 U.S.C. § 666, and 28 U.S.C. § 1367(a). As outlined above, jurisdiction does not exist under section 666, as this is not a dispute over the "use of water," or section 1367, as the supplemental jurisdiction statute cannot be used to gain jurisdiction over claims properly asserted in the Claims Court. Section 390uu does not provide jurisdiction. It governs disputes regarding contractual rights arising from reclamation law. The right to just compensation is a constitutional claim, not a contractual one. The existence of disputed contracts does not bring this claim within the scope of waiver of immunity provided by Section 390uu.

At hearing, Plaintiffs requested that if the Court determined it lacked jurisdiction to hear the inverse condemnation claim, it be dismissed without prejudice rather than be transferred to the claims court. Plaintiffs' inverse condemnation claim asserted against the Federal Defendants is dismissed without prejudice.[30]

## IV.

### CONCLUSION

Westlands' Motion to Dismiss is GRANTED as to Plaintiffs' claims for negligence as alleged in paragraph 166 through 168, trespass, and nuisance, which are DISMISSED WITH PREJUDICE, and breach of a mandatory duty, which is DISMISSED WITH LEAVE TO AMEND.

Westlands' Motion to Dismiss is DENIED in all other respects.

Federal Defendants' Motion for Judgment on the Pleadings is GRANTED as to Plaintiffs' claims regarding alleged NEPA viola-

---

**29.** Federal Defendants' Reply Brief, p. 6 (citing *Alpine Ridge Group v. Kemp,* 955 F.2d 1382, 1386 (9th Cir.1992)).

**30.** At hearing, Plaintiffs also suggested that the Court could retain jurisdiction over the "non-monetary aspects" of their taking claim. There is no purpose for doing so, other than the value

to the Plaintiffs in having a declaratory judgment which might serve as res judicata in the Claims Court. Such a procedure would impermissibly circumvent the jurisdictional limits of the Tucker Act, 28 U.S.C. § 1491. *See McKeel,* 722 F.2d at 590–91.

tions, negligence claims as alleged in paragraph 140 (except for subparagraph (a)), which are DISMISSED WITH PREJUDICE, and inverse condemnation claim, which is DISMISSED WITHOUT PREJUDICE.

Federal Defendants' Motion for Judgment on the Pleadings is DENIED in all other respects.

Federal Defendants' Motion for Partial Summary Judgment as to the issue of discretionary immunity is DENIED.

SO ORDERED.